# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

ENERGY FUTURE HOLDINGS CORP., *et al.*

Debtors.

Chapter 11
Case No. 14-10979-CSS
(Jointly Administered)

DELAWARE TRUST COMPANY, as TCEH
First Lien Indenture Trustee,

Plaintiff,

-against-

WILMINGTON TRUST, N.A., as First Lien
Collateral Agent and First Lien Administrative Agent,
*et al.*,

Defendants.

Adversary Proceeding
No. 15-51239-CSS

---

## OPENING BRIEF IN SUPPORT OF DEFENDANTS MORGAN STANLEY CAPITAL GROUP INC.'S AND J. ARON & COMPANY'S JOINT MOTION FOR JUDGMENT ON THE PLEADINGS

COZEN O'CONNOR
Simon E. Fraser (No. 5335)
Mark E. Felger (No. 3919)
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2011

-AND-

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Thomas J. Moloney (admitted *pro hac vice*)
Sean A. O'Neal (admitted *pro hac vice*)
Humayun Khalid (admitted *pro hac vice*)
Hugh K. Murtagh (admitted *pro hac vice*)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000

*Counsel for J. Aron & Company*

DLA PIPER LLP (US)
Ashley R. Altschuler (No. 3803)
R. Craig Martin (No. 5032)
Scott Czerwonka (No. 4844)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700

-AND-

CADWALADER, WICKERSHAM & TAFT LLP
Howard R Hawkins, Jr. (admitted *pro hac vice*)
Ellen M. Halstead (admitted *pro hac vice*)
Michele Maman (admitted *pro hac vice*)
Thomas J. Curtin (admitted *pro hac vice*)
One World Financial Center
New York, NY 10281
Telephone: (212) 504-6000

Mark C. Ellenberg (admitted *pro hac vice*)
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200

*Counsel for Morgan Stanley Capital Group Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

    1. BACKGROUND ....................................................................................4

    2. ADEQUATE PROTECTION .................................................................4

    3. THE NEW YORK STATE COURT ACTION ......................................6

    4. THE SDNY COURT DECISION............................................................7

    5. THE FIFTH AMENDED PLAN OF REORGANIZATION...................9

    6. THE FIRST AMENDED COMPLAINT................................................11

    7. THE 11.5% OFFERING MEMORANDUM..........................................13

    8. THE TCEH FIRST LIEN NOTES INDENTURE................................14

    9. ADDITIONAL RELEVANT PORTIONS OF THE CAICA..................15

    10. THE SECOND LIEN INTERCREDITOR AGREEMENT ...............17

STANDARD OF REVIEW ..................................................................................18

    1. THE COURT MAY ENTER A FINAL JUDGMENT ON THIS MOTION. ...............18

    2. RELEVANT LEGAL STANDARDS. ................................................19

ARGUMENT ......................................................................................................21

POINT I: WHILE DISALLOWED POST-PETITION INTEREST IS INCLUDED IN
THE DEFINITION OF SECURED OBLIGATIONS, IT IS NOT INCLUDED IN THE
THIRD PRIORITY OF THE  SECTION 4.1 WATERFALL BECAUSE IT IS NOT DUE
AND PAYABLE OR PRESENTLY DUE AND OWING IN THIS CASE ................21

    1. READING THE CAICA AS A WHOLE AND GIVING EFFECT TO THE
    PLAIN   MEANING   OF   ALL   OF   ITS   PROVISIONS   PRECLUDES
    PLAINTIFF'S ATTEMPT TO OBTAIN A PREFERENTIAL DISTRIBUTION ..........22

    2. THE OM FURTHER CONFIRMS THAT POST-PETITION INTEREST IS
    NOT "DUE AND PAYABLE" ........................................................27

POINT II: THE SECTION 4.1 WATERFALL DOES NOT APPLY TO THE DEBTORS' MONTHLY PAYMENTS OF ADEQUATE PROTECTION OR TO PLAN DISTRIBUTIONS ..............................................................................................28

    1. SECTION 4.1(A) OF THE CAICA DOES NOT APPLY TO THE MONTHLY PAYMENTS ................................................................................................................28

    2. SECTION 4.1(A) OF THE CAICA DOES NOT APPLY TO THE PLAN DISTRIBUTIONS ......................................................................................................32

        A. THE PLAN DISTRIBUTIONS ARE NOT THE RESULT OF AN "EXERCISE OF REMEDIES" BY THE COLLATERAL AGENT..............32

        B. THE PLAN DISTRIBUTIONS ARE NOT PROCEEDS OF COLLATERAL............................................................................................36

CONCLUSION..................................................................................................................38

# Table of Authorities

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 506 ........................................................................................ 21

28 U.S.C. § 157 ........................................................................................ 18-19

Fed. R. Civ. P. 12(b). ............................................................................... 19, 20

Fed. R. Civ. P. 12(c)…………………………………………………….... 1, 19, 20, 32, 34, 38

Fed. R. Civ. P. 12(d) ................................................................................ 20

Fed. R. Civ. P. 56 ..................................................................................... 1, 20, 38

Fed. R. Bankr. P. 7012 ............................................................................. 1, 38

Fed. R. Bankr. P. 7056 ............................................................................. 1, 38

**Cases**

10 Ellicot Square Court Corp. v. Mountain Valley Indem. Co.,
634 F.3d 112 (2d Cir. 2011) ..................................................................... 22

Barclays Capital Inc. v. Giddens (In re Lehman Bros. Holdings Inc.),
761 F.3d 303 (2d Cir. 2014), cert. denied, 135 S. Ct. 2048 (2015) .................. 30

Beal Sav. Bank v. Sommer,
8 N.Y.3d 318 (2007) ................................................................................ 22

Becker v. North's Rests., Inc.,
967 P.2d 1246 (Or. Ct. App. 1998) ........................................................... 23

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ................................................................................ 19

Capital Ventures Int'l v. Republic of Arg.,
652 F.3d 266 (2d Cir. 2011) ..................................................................... 30

Christianson v. Colt Indus. Operating Corp.,
486 U.S. 800 (1988) ................................................................................ 19

Citisteel USA, Inc. v. Gen. Elec. Co.,
78 F. App'x 832 (3d Cir. 2003) ................................................................ 20

CP III Rincon Towers, Inc. v. Cohen,
13 F. Supp. 3d 307 (S.D.N.Y. 2014) ........................................................ 23-24

<u>Del. Valley Sav. & Loan Ass'n v. Curtis (In re Curtis)</u>,
9 B.R. 110 (Bankr. E.D. Pa. 1981) ...................................................................... 29

<u>Dykes v. Se. Pa. Transp. Auth.</u>,
68 F.3d 1564 (3d Cir. 1995)............................................................................... 20

<u>Eames v. Nationwide Mut. Ins. Co.</u>,
412 F. Supp. 2d 431 (D. Del. 2006)............................................................... 19, 20

<u>Gordon v. Vincent Youmans, Inc.</u>,
358 F.2d 261 (2d Cir. 1965)............................................................................... 27

<u>Greenfield v. Philles Records, Inc.</u>,
98 N.Y.2d 562 (2002) ...................................................................................... 22

<u>Greenwich Capital Fin. Prod., Inc. v. Negrin</u>,
903 N.Y.S.2d 346 (N.Y. App. Div. 2010) ........................................................ 26-27

<u>In re BLX Grp. Inc.</u>,
419 B.R. 457 (Bankr. D. Mont. 2009) .................................................................. 29

<u>In re Deico Electronics</u>,
139 B.R. 945 (B.A.P. 9th Cir. 1992)................................................................. 28-29

<u>In re Eskim, LLC</u>,
No. 08-509, 2008 WL 4093574 (Bankr. N.D. W. Va. Aug. 28, 2008)........................ 29

<u>In re Holliday</u>,
No. 11-62315-13, 2012 WL 1579241 (Bankr. D. Mont. May 4, 2012) ...................... 29

<u>In re Holt</u>,
No. 09-62439-13, 2010 WL 3294693 (Bankr. D. Mont. Aug. 20, 2010)..................... 29

<u>In re The Lodge at Big Sky, LLC</u>,
454 B.R. 138 (Bankr. D. Mont. 2011) .................................................................. 29

<u>In re MPM Silicones, LLC</u>,
518 B.R. 740 (Bankr. S.D.N.Y. 2014)................................................... 32, 34, 36-37

<u>In re NMP Concord II, LLC</u>,
No. 10-43080 EDJ, 2010 WL 3488249 (Bankr. N.D. Cal. Sept. 1, 2010) .................. 29

<u>In re Pacific Lumber Co.</u>,
584 F.3d 229 (5th Cir. 2009) ............................................................................. 37

<u>In re Panther Mountain Land Dev.</u>,
438 B.R. 169 (Bankr. E.D. Ark. 2010) ................................................................. 29

In re Rizzotto,
No. 09-6096511, 2009 WL 2477232 (Bankr. D. Mont. Aug. 11, 2009) ........................... 29

In re Saarel,
No. 08-61684-11, 2009 WL 1941735 (Bankr. D. Mont. July 2, 2009) ............................ 29

In re Satcon Tech. Corp.,
No. 12-12869 KG, 2012 WL 6091160 (Bankr. D. Del. Dec. 7, 2012)............................ 29

In re Stembridge,
287 B.R. 658 (Bankr. N.D. Tex. 2002), rev'd on other grounds, 394 F.3d 383 (5th Cir.
2004) ........................................................................................................................ 30

In re Stembridge,
394 F.3d 383 (5th Cir. 2004) ............................................................................ 30

In re Steve Cavanaugh Ltd. P'ship,
No. 08-61002-11, 2009 WL 1323834 (Bankr. D. Mont. Apr. 29, 2009)........................... 29

In re Vest Assocs.,
217 B.R. 696 (Bankr. S.D.N.Y. 1998)................................................................... 8

In re W. Texas Mktg. Corp.,
155 B.R. 399 (Bankr. N.D. Tex. 1993)................................................................... 23

Jones v. ABN AMRO Mortg. Grp., Inc.,
551 F. Supp. 2d 400 (E.D. Pa. 2008), aff'd, 606 F.3d 119 (3d Cir. 2010) ........................ 19

Kelley v. Embrey (In re Embrey),
56 B.R. 626 (Bankr. W.D. Mo. 1986).................................................................... 29

Lamm v. State St. Bank & Tr. Co.,
889 F. Supp. 2d 1321 (S.D. Fla. 2012) ................................................................. 22

LNC Invs., Inc. v. First Fidelity Bank,
247 B.R. 38 (S.D.N.Y. 2000)........................................................................... 29

Magnolia Portfolio, LLC v. Dye (In re Dye),
502 B.R. 47 (Bankr. M.D. Pa. 2013) ................................................................... 28

Morse v. Lower Merion Sch. Dist.,
132 F.3d 902 (3d Cir. 1997)............................................................................. 19

Muzak Corp. v. Hotel Taft Corp.,
133 N.E.2d 688 (N.Y. 1956)............................................................................. 30

Ogbudimkpa v. Ashcroft,
342 F.3d 207 (3d Cir. 2003)............................................................................. 19

Papasan v. Allain,
478 U.S. 265 (1986)........................................................................................ 32

Pfizer, Inc. v. Ranbaxy Labs., Ltd.,
525 F. Supp. 2d 680 (D. Del. 2007)................................................................ 19

Pistole v. Mellor (In re Mellor),
734 F.2d 1396 (9th Cir. 1984) ........................................................................ 29

Rothenberg v. Lincoln Farm Camp, Inc.,
755 F.2d 1017 (2d Cir. 1985)..................................................................... 23, 24

Sec. Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC),
314 B.R. 436 (B.A.P. 9th Cir. 2004)............................................................... 29

Six Flags, Inc. v. Parc Mgmt., LLC (In re Premier Int'l Holdings, Inc.),
443 B.R. 320 (Bankr. D. Del. 2010) ............................................................... 20

Sterling Inv'r Servs., Inc. v. 1155 Nobo Assocs., LLC,
818 N.Y.S.2d 513 (App. Div. 2006) ............................................................... 32

Tamarind Resort Assocs. v. Gov't of Virgin Islands,
138 F.3d 107 (3d Cir. 1998)............................................................................. 20

Travelers Ins. Co. v. Plaza Family P'ship (In re Plaza Family P'ship),
95 B.R. 166 (E.D. Cal. 1989)........................................................................... 29

Turbe v. Gov't of Virgin Islands,
938 F.2d 427 (3d Cir. 1991)............................................................................. 19

U.S. Bank. Nat'l Ass'n v. Barclays Bank PLC,
No. 11 Civ. 9199 (WHP), 2013 WL 1180414 (S.D.N.Y. Mar. 12, 2013)........ 23

United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,
484 U.S. 365 (1988) ................................................................................. 8, 21, 29

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)............................................................. 23

Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force,
65 Bus. Law 809 (2010)...........................................................................24-25, 33

Richard Wright, et al., The LSTA's Complete Credit Agreement Guide
(McGraw Hill 2009) ......................................................................................... 26

Defendants Morgan Stanley Capital Group Inc. ("Morgan Stanley") and J. Aron & Company ("J. Aron") submit this brief in support of their joint motion for judgment on the pleadings to dismiss the First Amended Complaint (ECF No. 30) (the "FAC") of plaintiff Delaware Trust Company ("Plaintiff") with prejudice, pursuant to Federal Rule of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12(c), or, in the alternative, for summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 (the "Motion").  In support thereof, Morgan Stanley and J. Aron state as follows:

## PRELIMINARY STATEMENT

Although the holders of the 11.5% notes are unquestionably undersecured and therefore not entitled to make any claim against the debtors for post-petition interest, they nevertheless ask this Court to require the debtors to make adequate protection payments and plan distributions as if they were entitled to post-petition interest at their contract rate.  Plaintiff claims that this unprecedented windfall recovery is somehow mandated by the Collateral Agency and Intercreditor Agreement, dated as of October 10, 2007, amended and restated as of August 7, 2009 ("CAICA").  See Declaration of Hugh K. Murtagh dated, October 9, 2015 ("Murtagh Decl."), Ex. A.  Plaintiff's attempt to find a basis for a preferential entitlement in an agreement that simply provides rules for the administration of a *pari passu* lien among multiple creditors fails on multiple levels, including because the CAICA:  (1) grants no priority to a post-petition interest claim that is not "actually due and owing" and "due and payable" from the debtors; and (2) in any event, is inapplicable here, because none of the conditions for its application have been satisfied.

First, the section of the CAICA relied on by Plaintiff for its claimed preferential entitlement applies only to the "amount," including interest, that is "presently due and owing"

1

and "due and payable," i.e., not some phantom entitlement but only the amount actually owing and legally enforceable against the debtors. Section 4.1(a) of the CAICA establishes a common "<u>third</u>" priority for payments to all Secured Parties (as defined in the CAICA), including all the parties to this dispute, that is explicitly limited to "Obligations" (as defined in the CAICA) that are "<u>due and payable</u>." Murtagh Decl., Ex. A § 4.1 (emphasis added); <u>see also</u> <u>id.</u> § 4.3 (limiting "Secured Obligations" to those "<u>presently due and owing</u>") (emphasis added). There is no dispute that post-petition interest is not payable on undersecured claims as of the petition date. Thus, the amounts Plaintiff seeks to include are not "presently due and owing;" they are neither due from, nor payable by, the debtors.

Section 4.1 also contains a "last" catch-all provision, which applies, *inter alia,* to any remaining unpaid secured obligations (whether or not due and payable). Murtagh Decl., Ex. A § 4.1. The excess interest claims by the TCEH 11.5% noteholders would be payable based on collateral turnover rights against second lien creditors, if at all, under this provision. No such rights exist here. Plaintiff is therefore attempting to shoehorn the excess interest into the third priority because the collateral will only reach the third priority. Plaintiff's gambit, however, is defeated by the plain language of the CAICA.

The conclusion that the CAICA is inapplicable to the adequate protection and plan distributions is confirmed by the Offering Memorandum for the TCEH 11.5% notes (the "<u>OM</u>"). <u>See</u> Murtagh Decl., Ex. B. The very first page of the OM states that "the notes will be senior obligations of the Issuer and <u>will rank equally in right of payment with all existing and future senior debt of the Issuer</u>." <u>Id.</u> at i (emphasis added). Prospective bondholders were also informed that upon a Texas Competitive Electric Holdings Company LLC ("<u>TCEH</u>") chapter 11 filing, the Bankruptcy Code would not permit the further "accrual of post-petition interest, costs

and attorneys' fees," and they would simply have an undersecured claim for any such shortfall. Id. at 55. The OM also confirmed that all "First Lien Obligations" are "*pari passu*," id. at 102, and that any collateral distribution pursuant to a plan of reorganization would be made to such creditors on a ratable basis, id. at 8.

Further undercutting Plaintiff's case is the fact that the TCEH 11.5% noteholders were not even original signatories to the CAICA. Rather, they were added at a later date, when their trustee acceded to the provisions of the agreement. Thus, Plaintiff would have the Court believe not only that the original signatories (including Morgan Stanley and J. Aron) agreed to have their collateral distributions diluted by phantom interest claims, but that they put themselves at risk to potentially higher rates of interest by future creditors, who did not even participate in the negotiation or drafting of the agreement.

Second, the CAICA's Section 4.1 waterfall also does not support Plaintiff's claim, because it only applies in the context of (1) a distribution by the Collateral Agent (as defined in the CAICA) (2) of collateral or the proceeds of collateral (3) received as a result of its "exercise of remedies." Murtagh Decl., Ex. A § 4.1. Neither the adequate protection payments nor the plan distributions result from the exercise of remedies by the Collateral Agent or are collateral or the proceeds of collateral. Here, the Collateral Agent has not exercised any remedies under the applicable security agreement. Moreover, the Collateral Agent has received no property to distribute.

Each of the grounds set forth above, and elaborated upon below, provide an independent basis for dismissing the FAC. Accordingly, Morgan Stanley's and J. Aron's Motion for judgment on the pleadings should be granted, and the FAC should be dismissed with prejudice.

## STATEMENT OF FACTS

1. **Background**

In 2007, Energy Future Competitive Holdings Company, TCEH, and certain of their subsidiaries (collectively, the "TCEH Obligors" and, after the April 29, 2014 petition date, the "Debtors") incurred certain indebtedness, including obligations arising under the Credit Agreement dated as of October 10, 2007, as amended and restated pursuant to the December 2012 Extension Amendment (the "Credit Agreement"), see Murtagh Decl., Ex. D, with Citibank N.A., as the administrative agent (the "Administrative Agent"), as well as obligations related to commodity and interest rate swaps with Morgan Stanley and J. Aron, among others.  The swaps and bank debt are secured by a *pari passu* lien on substantially all of the TCEH Obligors' assets. To establish the *pari passu* lien among multiple creditors, the TCEH Obligors, J. Aron, Morgan Stanley, and the Administrative Agent entered into the CAICA.   Plaintiff's predecessor purportedly acceded to the CAICA in 2011, in its capacity as indenture trustee for certain 11.5% senior secured notes issued in 2011 and due 2020 (the "TCEH First Lien Notes" or the "TCEH 11.5% Notes").  See Murtagh Decl., Ex. C ¶ 2; Accession Agreement, dated as of April 19, 2011 (the "Accession Agreement"), Murtagh Decl., Ex. E.

2. **Adequate Protection**

As of the petition date, the Debtors represented that they had over $25 billion of first lien debt, including (i) $22 billion of debt outstanding under the Credit Agreement (the "Bank Debt," and holders of such Bank Debt, the "Lenders"), with defendant Wilmington Trust, N.A. ("Wilmington") as the Administrative Agent; (ii) $1.75 billion of debt outstanding under the indenture for the TCEH First Lien Notes (the holders of such TCEH First Lien Notes, the "TCEH First Lien Noteholders" or the "TCEH 11.5% Noteholders"); and (iii) approximately

$1.255 billion of debt outstanding under first lien interest rate swap and commodity hedge agreements (the "TCEH First Lien Swaps"), including the amounts owed to Morgan Stanley and J. Aron (the "TCEH First Lien Swap Providers" and together with the TCEH First Lien Noteholders and the Lenders, the "TCEH First Lien Creditors").  See Decl. of Paul Keglevic, Officer of Energy Future Holdings Corp., Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., *et al.*, in Support of First Day Motions, dated Apr. 29, 2014, Murtagh Decl., Ex. F at 30-31, 93 n.61.  Morgan Stanley and J. Aron timely filed proofs of claim in the bankruptcy proceedings against the Debtors with respect to their respective first lien swap claims and the obligations due thereunder.  See, e.g., Claim Nos. 5306, 9555.

On June 6, 2014, the Court entered a final order (A) authorizing use of cash collateral, (B) granting adequate protection, and (C) modifying the automatic stay (as amended or supplemented, the "Cash Collateral Order").  See Murtagh Decl., Ex. G.  Pursuant to the Cash Collateral Order, all TCEH First Lien Creditors, including Morgan Stanley and J. Aron, became entitled to receive their ratable share of adequate protection payments.  See id. at 27-28, 32.  In addition, the Cash Collateral Order provides: "All parties reserve all rights, claims, and defenses with respect to the amount of such claims, including the right to object to the amount of such claims and to assert additional or different amounts at any time."  Id. at 29.

The Cash Collateral Order fixed monthly adequate protection payments (the "Monthly Payments") in an amount equal to LIBOR plus 450 basis points.  See Murtagh Decl., Ex. G at 27.  In order to accommodate the unresolved question as to applicability of the CAICA to the adequate protection payments, the Cash Collateral Order also provided that an amount equal to the difference between payments based on the claim amounts as of the petition date (the

"Petition Date Allocation Method") and payments based on the amounts that would otherwise be payable if post-petition interest were included in the calculations of each First Lien Creditor's pro rata share (the "Postpetition Interest Allocation Method") should be held in an escrow account (the "Holdback Amounts").  See id. at 32-33.

### 3.    The New York State Court Action

Plaintiff filed its original complaint (the "Complaint") on March 13, 2015, in the New York State Supreme Court, Commercial Division (the "State Court"), alleging that the TCEH First Lien Noteholders are entitled to an "increas[ing]" share of adequate protection payments over time, relative to other TCEH First Lien Creditors.   Murtagh Decl., Ex. H. Plaintiff based its claim to an increasing share of payments on the grounds that the TCEH First Lien Noteholders would allegedly earn post-petition interest at a higher rate than other TCEH First Lien Creditors.  Id. ¶ 32.

Despite the implications of these allegations for all TCEH First Lien Creditors, Plaintiff named only two defendants: Wilmington, in its capacity as Collateral Agent and Administrative Agent, and Bank of New York Mellon Trust Company, N.A. ("BONY"), in its capacity as escrow agent.  See Murtagh Decl., Ex. H ¶¶ 8, 10 n.5.[1]  Morgan Stanley and J. Aron, who share in the first lien with all TCEH First Lien Creditors, were not named as defendants in the action.

On April 10, 2015, Morgan Stanley, J. Aron and Titan Investment Holdings LP ("Titan") (a secured lender) filed motions to intervene as defendants.  See Mem. of Law in

---

[1] On April 13, 2015, before this action was removed to federal court, Plaintiff filed a Notice of Dismissal Without Prejudice of Nominal Defendant The Bank of New York Mellon Trust Company, N.A. Pursuant to N.Y. C.P.L.R. § 3217(a)(1), which was so ordered by the State Court that day.  See Stipulation and Order of Dismissal Without Prejudice of Nominal Defendant the Bank of New York Mellon Trust Company, N.A. Pursuant to N.Y. C.P.L.R. § 3217(a)(1), Delaware Trust Co. v. Wilmington Trust N.A., Index No. 650792/2015 (Sup. Ct. N.Y. Cty. Apr. 13, 2015), ECF No. 47.

Support of the Joint Application of Morgan Stanley Capital Group, Inc. and J. Aron & Company

for an Order to Show Cause to Intervene, <u>Delaware Trust Co. v. Wilmington Trust N.A.</u>, Index

No. 650792/2015 (Sup. Ct. N.Y. Cty. Apr. 10, 2015), ECF No. 25; Mem. of Law in Support of

Titan Investment Holdings LP's Order to Show Cause to Intervene, <u>Delaware Trust Co. v.</u>

<u>Wilmington Trust N.A.</u>, Index No. 650792/2015 (Sup. Ct. N.Y. Cty. Apr. 10, 2015), ECF No.

29.  On April 14, 2015, Wilmington removed the action to the United States District Court for

the Southern District of New York (the "<u>SDNY Court</u>").  <u>See</u> Notice of Removal, <u>Delaware</u>

<u>Trust Co. v. Wilmington Trust N.A.</u>, Index No. 650792/2015 (Sup. Ct. N.Y. Cty. Apr. 14, 2015),

ECF No. 48.

### 4.  **The SDNY Court Decision**

On July 23, 2015, Judge Paul Engelmayer of the SDNY Court issued an opinion

and order granting the motions of Morgan Stanley, J. Aron, and Titan to intervene in this action

and their joint motion to transfer it from the Southern District of New York to the United States

District Court for the District of Delaware for reference to this Court (the "<u>SDNY Opinion</u>").

<u>See</u> Murtagh Decl., Ex. I.[2]

In the SDNY Opinion, Judge Engelmayer held that this action was a core

proceeding for four independent reasons:

> First, reviewing the history of this dispute, it is clear that it "would
> have no practical existence but for" the bankruptcy proceedings
> . . . .  Given this dispute's origins and nature [allegedly a choice
> between a "Petition Date" and a "Postpetition Allocation
> Method"], it could only have arisen during, and in connection with,
> ongoing bankruptcy proceedings.
> ***
> Second, the present dispute among creditors will affect the
> allocation of money currently in the Debtors' coffers, and the
> allocation of such money is itself a core bankruptcy function.

---

[2] The SDNY Court simultaneously denied Plaintiff's motion to remand to the State Court.

***

Third, . . . although the contract in the present case preceded the bankruptcy, the dispute did not. Far from being "independent" of the bankruptcy, this dispute emerged in the bankruptcy proceedings, would not exist absent those proceedings, and is intertwined with them.  Indeed, notably, in the bankruptcy court, Aurelius—one of the [TCEH] First Lien Noteholders whom plaintiff Delaware Trust represents— . . . described the outcome of the allocation dispute as a "precursor to how distributions might be made under a plan" of reorganization. . . .  The present dispute is therefore particular to and "uniquely affected by" this bankruptcy. . . .  It also appears likely to "directly affect a core bankruptcy function"—whether to confirm a proposed plan of reorganization.

***

Fourth, it appears that the court that resolves the allocation dispute may be called upon to consider the interaction between provisions of the Intercreditor Agreement and bankruptcy law and principles. . . .  As noted, Delaware Trust seeks a declaration that monthly adequate protection payments should be allocated based on the accrual of postpetition interest. However, under the Bankruptcy Code, interest is no longer to accrue on the First Lien obligations unless they are oversecured or the Debtors are solvent[3] . . . .  The likely relevance of bankruptcy law supports a finding of "arising in" jurisdiction.[4]

SDNY Opinion at 17-25 (citations omitted).

On July 30, 2015, this action was transferred to the United States District Court

for the District of Delaware.   See Delaware Trust Co. v. Wilmington Trust, N.A.,

No. 1:15-cv-00657-GMS (D. Del. July 30, 2015), ECF No. 73.  On September 1, 2015, this

---

[3] Citing 11 U.S.C. § 506(b); United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372–73 (1988) ("Since this provision [§ 506(b)] permits postpetition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest."); In re Vest Assocs., 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) ("While the general rule in bankruptcy is that 'interest on debtors' obligations ceases to accrue at the beginning of the proceedings,' post-petition interest continues to accrue on oversecured claims until payment of the claims or until the effective date of a confirmed plan.") (quoting Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 163 (1946); citing Rake v. Wade, 508 U.S. 464, 466 (1993)).

[4] The SDNY Court cited, as a second example of interaction with bankruptcy law, the dispute (discussed herein) over whether the adequate protection payments – or the contemplated distributions under the Debtors' plan of reorganization – are "Collateral or any proceeds thereof" within the meaning of the CAICA.  SDNY Opinion at 24-25.

action was referred to this Court.  See Order, <u>Delaware Trust Co. v. Wilmington Trust, N.A.</u>, No. 15-51239 (Bankr. D. Del. Sept. 1, 2015), ECF No. 1.

**5.   <u>The Fifth Amended Plan Of Reorganization</u>**[5]

On September 21, 2015, the Debtors filed their Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., *et al.*, Pursuant to Chapter 11 of the Bankruptcy Code (the "<u>Plan</u>"), <u>In re Energy Future Holdings Corp.</u>, No. 14-10979 (CSS) (Bankr. D. Del. Sept. 21, 2015), ECF No. 6122, together with their Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., *et al.*, Pursuant to Chapter 11 of the Bankruptcy Code (the "<u>DS</u>"), <u>In re Energy Future Holdings Corp.</u>, No. 14-10979 (CSS) (Bankr. D. Del. Sept. 21, 2015), ECF No. 6124, for the Plan.[6]  As explained in the DS and fully expressed in the Plan, a new entity, "Reorganized TCEH," will succeed to all of the interests of old TCEH in the subsidiaries of old TCEH, after all claims against such subsidiaries are released through the Plan confirmation process.  See DS §§ I.C.1, VI.B.2.

Under the Plan, the TCEH First Lien Creditors will receive: (i) 100% of the common stock of Reorganized TCEH ("<u>TCEH Common Stock Distribution</u>"); (ii) 100% of (x) the TCEH Debtors' Cash on hand and (y) net Cash proceeds from the issuance of New Reorganized TCEH Debt and the Preferred Stock Sale (the "<u>Cash Distribution</u>") (or, potentially, all or a portion of the New Reorganized TCEH Debt); (iii) Rights to purchase $700 million in the aggregate of New EFH Common Stock pursuant to the Rights Offering and the New EFH Common Stock purchased pursuant to the exercise of Rights (the "<u>Purchase Rights Distribution</u>"); (iv) Assigned C5 Rights and Cash-Out Election Pool Excess Cash (the "<u>Excess</u>

---

[5] Capitalized terms used but not defined in this section have the meaning given them in the Plan.

[6] The FAC references the Fourth Amended Joint Plan of Reorganization.  Murtagh Decl., Ex. C ¶¶ 1, 42.  As clarified by an errata sheet filed by Plaintiff on September 28, 2015, the FAC intends to reference the current, i.e., fifth, Plan.  Notice of Errata Regarding First Amended Compl., Sept. 28, 2015, ECF No. 40.

Cash Distribution"); and (v) TRA Rights, if any (the "TRA Distribution," and together, the "Distributions").  Plan Art. III.B.28.

The Plan states that the TCEH Common Stock Distribution, the Cash Distribution, and the TRA Distribution (together, the "Disputed Distributions") – but not the Purchase Rights Distribution or the Excess Cash Distribution (together, the "Uncontested Distributions") – are subject to the allocation dispute among TCEH First Lien Creditors.  Plan Art. I.A (defining "TCEH First Lien Creditor Distributions" and "TCEH First Lien Creditor Plan Distribution Allocation Dispute").  The Plan provides that the Uncontested Distributions shall be distributed pro rata on the basis of allowed claims – i.e., claim amounts as of the petition date. Id. Art. III.B.28.  The Plan further provides that the Disputed Distributions will be distributed either pro rata on the basis of allowed claims, or, if this Court orders otherwise, then as this Court orders.  Id.  The Plan further provides that the Disputed Distributions may be made either directly to TCEH First Lien Creditors (if this Court holds such distributions are not Collateral or proceeds thereof) or to the Collateral Agent (if the Court holds the opposite).  Id. Art. VI.D.4.[7]

The Plan provides that, concurrently with all distributions thereunder,  all security interests, including Liens, shall be fully released:

> On the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date . . . , all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests

---

[7] Previous iterations of the Plan provided that all Distributions would be made pro rata on the basis of allowed claims and provided for distribution directly to TCEH First Lien Creditors.  See Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code, Art. III.C.28, VI.B, In re Energy Future Holdings Corp., No. 14-10979 (CSS) (Bankr. D. Del. Aug. 10, 2015), ECF No. 5244.

shall revert to the Reorganized Debtors and their successors and assigns.

Id. Art. VIII.B.

6.    **The First Amended Complaint**

On September 22, 2015, Plaintiff filed its FAC.   On September 30, 2015, Morgan Stanley and J. Aron timely filed their respective Answers and Affirmative Defenses (respectively, the "Morgan Stanley Answer" and the "J. Aron Answer").   See Murtagh Decl., Ex. J; id. Ex. K.[8]

In the FAC, Plaintiff asserts three claims.   First, Plaintiff asserts a claim for a declaratory judgment that Plan Distributions must be made pursuant to a "Post-Petition Interest Allocation Calculation" – i.e., a calculation that adjusts TCEH First Lien Creditors' proportional shares to account for notional post-petition interest – together with declarations of the specific interest rates to be used in applying such calculation and the resulting amounts of Distributions for each of the TCEH First Lien Creditors.   Second, Plaintiff asserts a claim for a declaratory judgment that the adequate protection Holdback Amounts must be allocated to the TCEH First Lien Noteholders.   Third, Plaintiff asserts a claim for specific performance requiring Wilmington to distribute the Plan Distributions and Holdback Amounts in accordance with the sought-after declaratory judgments.   Murtagh Decl., Ex. C ¶¶ 65-87.

Thus, as previewed by the SDNY Court when granting transfer, Plaintiff now seeks judgments that it is entitled to an increased, and still increasing, share not only of the adequate protection Monthly Payments but also of all Distributions. Plaintiff claims that all Distributions, not just the Disputed Distributions identified in the Plan, must be made according

---

[8] Titan and Wilmington Trust (in both its capacity as First Lien Administrative Agent and First Lien Collateral Agent) also filed respective Answers on September 30, 2015.

to its Post-Petition Interest Allocation Method and purports to reserve the right to object to confirmation of the Plan.  Murtagh Decl., Ex. C ¶ 44 n.21.

Plaintiff's theory of the case is that because the Monthly Payments and Distributions are allegedly Collateral (as defined in the Security Agreement, dated as of October 10, 2007, amended and restated as of August 7, 2009 (the "Security Agreement")), see Murtagh Decl., Ex. L, or proceeds thereof, the Collateral Agent must distribute them to TCEH First Lien Creditors pursuant to the payment waterfall of the CAICA, which, Plaintiff alleges, requires calculating TCEH First Lien Creditors' proportional shares based not only on such creditors' outstanding prepetition obligations but also on "accrued but unpaid" post-petition interest, whether or not such interest is allowed or allowable in the Debtors' cases (the calculation Plaintiff refers to as the "Post-Petition Interest Allocation Calculation").  Murtagh Decl., Ex. C ¶ 25; see also id. ¶¶ 23-34.

Plaintiff claims this methodology is required – even though neither the "Post-Petition Interest Allocation Calculation" nor any equivalent formula appears in the CAICA – because of the use of the defined term "Secured Obligation" in the third priority established in the Section 4.1 waterfall.  Specifically, Plaintiff points to the language in Section 4.1 directing the Collateral Agent to allocate Collateral:

> third, on a pro rata basis, to the payment of, without duplication, (a) all principal and other amounts then due and payable in respect of the Secured Obligations . . . .

Murtagh Decl., Ex. C ¶ 27 (quoting Murtagh Decl., Ex. A § 4.1).

Secured Obligations under the CAICA, in turn, include:

> all obligations of every nature outstanding under any Additional Obligations [including the TCEH First Lien Notes], whether fixed or contingent, matured or unmatured, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding.

"Secured Obligations" shall include, without limitation, interest accruing at the then applicable rate provided in the applicable Financing Document after the maturity date of the relevant Secured Obligations and any Post-Petition Interest.

Murtagh Decl., Ex. C ¶ 28 (quoting Murtagh Decl., Ex. A § 1.1) (emphasis modified).

Post-Petition Interest, in turn, includes:

any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency or Liquidation Proceeding, whether or not allowed or allowable in any such Insolvency or Liquidation Proceeding.

Murtagh Decl., Ex. A § 1.1; see also Murtagh Decl., Ex. C ¶ 29.

Plaintiff claims these definitions increase the size of the TCEH First Lien Noteholders' claims for purposes of the Section 4.1 distribution formula based on their theoretical contractual entitlements regardless of whether they are enforceable against the Debtors.  According to Plaintiff, the CAICA "clearly reflects the intent of the TCEH First Lien Creditors to maintain the sharing (i.e., allocation) arrangements provided in the [CAICA] regardless of the potential bankruptcy of any Obligor," and to calculate the "pro rata . . . based on dividing the Secured Obligations then due and payable at the time the allocation is actually made, not as the situation existed as of the filing date of an Obligor bankruptcy."  Murtagh Decl., Ex. C ¶¶ 30-31 (emphasis in original).  Plaintiff offers no allegation or explanation why, when, as is indisputably the case here, the Debtors are insolvent and the TCEH First Lien Creditors are undersecured, any additional Secured Obligations became "due and payable" after the petition date.

7.  **The 11.5% Offering Memorandum**

The OM for the TCEH First Lien Notes explained in its opening page that "the notes will be senior obligations of the Issuer and will rank equally in right of payment with all

existing and future senior debt of the Issuer." Murtagh Decl., Ex. B at i. Similarly, in the summary of the notes, the OM explained again that the "[N]otes will be . . . secured on a first-priority basis by a lien on the Collateral <u>equally and ratably</u> with [all current] and any future obligations of the Issuer that are secured by a first-priority lien on the Collateral." <u>Id.</u> at 9 (emphasis added). The OM further confirmed that First Lien Obligations are – and will be defined in the indenture as – "*pari passu*." <u>Id.</u> at 102.

The OM also expressly stated that, upon a chapter 11 filing of an Obligor, the "principal, premium, if any, and interest on all outstanding Notes will become due and payable without further action or notice," Murtagh Decl., Ex. B at 82, but cautioned that post-petition interest would not accrue and would not become due and payable in an undersecured bankruptcy:

> [I]f at the time of the filing the value of the Collateral is less than the amount of principal and accrued and unpaid interest on the notes, and other debt secured by liens on the Collateral that are equal and ratable with the liens securing the notes, <u>interest may cease to accrue</u> on the notes thereafter.
>
>                     \*\*\*
>
> The Bankruptcy Code <u>permits only the payment and/or accrual of post-petition interest</u>, costs and attorneys' fees to a secured creditor during a debtor's bankruptcy case <u>to the extent the value of the Collateral is determined by the bankruptcy court to exceed the aggregate outstanding principal amount</u> at maturity of the obligations secured by the Collateral, including any obligation secured on a priority basis.

<u>Id.</u> at 24, 55 (emphasis added).

### 8.  <u>The TCEH First Lien Notes Indenture</u>

Consistent with the explanations of the OM, the indenture for the TCEH First Lien Notes (the "<u>TCEH First Lien Notes Indenture</u>" or the "<u>Indenture</u>") defines First Lien Obligations to "mean[] Liens securing Obligations under the [Credit Agreement and TCEH First Lien Swaps], this Indenture, the Notes and any other Indebtedness secured on a *pari passu* basis

with the TCEH Senior Secured Facilities, without giving effect to any payment priority provisions."   Murtagh Decl., Ex. M.   As with "Secured Obligations" under the CAICA, "Obligations" under the Indenture include post-petition interest, or "any interest accruing subsequent to the filing of a petition in bankruptcy . . . whether or not such interest is an allowed claim under applicable state, federal or foreign law."  Id.  Notably, upon a chapter 11 filing of an Obligor, the Indenture does not render all Obligations due and payable.   Rather only the "principal, premium, if any, and interest on all outstanding Notes shall be due and payable immediately without further action or notice."  Id. § 6.02.

### 9.   Additional Relevant Portions Of The CAICA

The CAICA "defin[es] the relative rights of Secured Parties."   Murtagh Decl., Ex. A  § 9.17 (stating that "[n]othing in this Agreement is intended to or shall impair the obligations of [TCEH] or any Guarantor, which are absolute and unconditional, to pay the Secured Obligations as and when the same shall become due and payable in accordance with their terms").  Section 2.1 of the CAICA provides as follows:

> 2.1 Pari Passu.  As among the Secured Parties, all Liens on the Collateral shall rank *pari passu*, no Secured Party shall be entitled to any preferences or priority over any other Secured Party with respect to the Collateral (except as otherwise provided in Section 4.1) and the Secured Parties shall share in the Collateral and all Proceeds thereof in accordance with the terms of this Agreement.

Id. § 2.1.  The TCEH First Lien Creditors are all Secured Parties.  See id. § 1.1 (definitions); Accession Agreement.  "Proceeds" is not defined in the CAICA.

Section 4.1 provides:

> 4.1 Application of Proceeds. Regardless of any Insolvency or Liquidation Proceeding which has been commenced by or against the Borrower or any other Loan Party, Collateral or any proceeds thereof received in connection with the sale or other disposition of,

or collection on, such Collateral upon the exercise of remedies under the Security Documents by the Collateral Agent shall be applied in the following order (it being agreed that the Collateral Agent shall apply such amounts in the following order as promptly as is reasonably practicable after the receipt thereof; provided that such amounts shall not be so applied until such time as the amount of the Secured Obligations has been determined in accordance with the terms hereof and under the terms of the relevant Financing Document, including and subject to Section[] 4.3 . . . below)

(a) with respect to all Collateral . . . :

first, on a pro rata basis, to the payment of all amounts due to the Collateral Agent, any Agent, and the Issuing Lenders (in such capacities) . . .

second, on a pro rata basis to any Secured Party which has theretofore advanced or paid any fees to any Agent or Issuing Lender . . .

third, on a pro rata basis, to the payment of, without duplication, (a) all principal and other amounts then due and payable in respect of the Secured Obligations . . . and

last, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full in cash, to the Loan Parties or as otherwise required by applicable law.

Murtagh Decl., Ex. A § 4.1(a).

Section 4.3 provides that, upon the receipt of any Collateral or proceeds thereof, the Collateral Agent shall request from the Secured Parties, and shall base its distributions of such Collateral or proceeds upon, certifications of "the aggregate amount of the Secured Obligations . . . then outstanding and owed by the [TCEH Obligors] . . . to be certified . . . as presently due and owing." Murtagh Decl., Ex. A § 4.3 (emphasis added).

Section 5.6 provides that "the Collateral may secure additional obligations of the [TCEH Obligors] . . . and the . . . obligations . . . shall become 'Secured Obligations' hereunder," provided that certain conditions are met, including that the newly secured party shall "be treated

in the same manner as the other Secured Parties under [the CAICA]" and that the TCEH Obligors certify that the newly secured party shall be secured "equally and ratably with all previously existing and future Secured Obligations."[9]  Murtagh Decl., Ex. A  ¶ 5.6.  Moreover, the TCEH Obligors are only permitted to incur debt that qualifies as "Additional Obligations," which is defined to mean "any Indebtedness or other obligations . . . secured by a First Lien on all or a portion of the Collateral, in each case to the extent permitted (if addressed therein, or, otherwise, not prohibited) under the Credit Agreement."  Id. § 1.1 (emphasis added); see also id. § 5.6 (requiring that Additional Obligations be permitted under the express terms of the Credit Agreement).  Under the Credit Agreement, the TCEH Obligors are only permitted to incur secured notes to the extent that such obligations are ranked junior to or equally with the first lien obligations.  See Murtagh Decl., Ex. D § 1.1 (defining "Permitted Other Notes"); id. § 10.2.[10]

**10. The Second Lien Intercreditor Agreement**

The TCEH Obligors, the first lien collateral agent and certain second lien creditors are parties to a second lien intercreditor agreement, dated as of October 6, 2010 (the "Second Lien ICA" or "SLICA").  See Murtagh Decl., Ex. N.  The Second Lien ICA expressly provides that the second lien creditors would be subordinate to the TCEH First Lien Creditors' claims and liens.  See, e.g., id. § 2.01 (providing that the liens of the TCEH First Lien Creditors are senior to the second lien creditors, notwithstanding the Uniform Commercial Code); id. § 4.01 (requiring that the TCEH First Lien Creditors' claims be paid first in full before second lien

---

[9] Secured Obligations is defined to include "all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan . . . entered into with [Energy Future Competitive Holdings Company], [TCEH] or any other Restricted Subsidiary of [TCEH]."  Murtagh Decl., Ex. A § 1.1.  The Secured Obligations are discharged when, among other things, there is "payment in full in cash of all other Secured Obligations that are then due and payable or otherwise accrued."  Id.

[10] As defined in the Credit Agreement, the term "Permitted Other Notes" means "senior secured notes . . . which notes, if secured, may either have the same lien priority as the Obligations or may be secured by a Lien ranking by Lien ranking junior to the Lien securing the Obligations."  Murtagh Decl., Ex. D § 1.1 (emphasis added).

creditors are paid, regardless of whether the TCEH First Lien Creditors' claims are currently due

and payable).    In that regard, the Second Lien ICA contains certain protections of the

entitlements of the TCEH First Lien Creditors – referred to therein as Senior Secured Parties and

their indebtedness as Senior Obligations – including two provisions relating to turnover, as

follows:

> SECTION 4.01  Application of Proceeds.  All Shared Collateral
> and Proceeds thereof received in connection with the Disposition
> or collection of the Shared Collateral in connection with an
> Enforcement Action, whether or not pursuant to an Insolvency or
> Liquidation Proceeding, shall be distributed as follows: first, to the
> payment on a pro rata basis of costs and expenses of each Agent,
> as applicable, in connection with such Enforcement Action;
> second, to the Senior Collateral Agent for application to the Senior
> Obligations in accordance with the terms of the Senior Debt
> Documents, until the Discharge of Senior Obligations has occurred
> . . . .
>
> SECTION 4.02 Payments Over. So long as the Discharge of Senior
> Obligations has not occurred, any Shared Collateral or Proceeds
> thereof received by any Second Priority Representative or any
> Second Priority Secured Party in contravention of this Agreement
> shall be segregated and held in trust for the benefit of and forthwith
> paid over to the Senior Collateral Agent for the benefit of the
> Senior Secured Parties.

Murtagh Decl., Ex. N §§ 4.01, 4.02.

There is no comparable turnover provision or express lien or debt subordination

provision in the CAICA.

## STANDARD OF REVIEW

### 1.  The Court May Enter A Final Judgment On This Motion

As a preliminary matter, this Court may enter a final judgment on this Motion.

As Judge Engelmayer of the SDNY Court held in a thoroughly reasoned opinion, there are no

fewer than four independent grounds supporting the conclusion that this action is a "core

proceeding" under 28 U.S.C. § 157.  This holding is now law of the case.  "Under the law-of-the-case doctrine once an issue has been decided, parties may not relitigate that issue in the same case."  Ogbudimkpa v. Ashcroft, 342 F.3d 207, 210 n.7 (3d Cir. 2003) (internal quotations omitted).  "[T]he doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions."  Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988).  Moreover, Plaintiff admits that the SDNY Court already "determined that this matter was a core proceeding."  Murtagh Decl., Ex. C ¶ 15 n.8.  Accordingly, the core determination may not be relitigated.[11]

## 2.  **Relevant Legal Standards**

"A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is governed by the same standards that apply to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)."  Pfizer, Inc. v. Ranbaxy Labs., Ltd., 525 F. Supp. 2d 680, 684 (D. Del. 2007); see also Turbe v. Gov't of Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991).  To survive a motion to dismiss under either rule, a complaint must state a claim for relief that is "plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  While the Court must accept the well-pleaded factual allegations of the complaint as true, conclusory allegations and "bald assertions" are not well-pleaded and should be disregarded.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997) (quotations omitted); see also Eames v. Nationwide Mut. Ins. Co., 412 F. Supp. 2d 431, 436 (D. Del. 2006) (plaintiffs' legal conclusions with respect to a contract need not be treated as true); Jones v. ABN AMRO Mortg. Grp., Inc., 551 F. Supp. 2d 400, 405-06 (E.D. Pa. 2008), aff'd, 606 F.3d 119 (3d Cir. 2010).

---

[11] In addition, and as noted in the Morgan Stanley Answer and the J. Aron Answer, Plaintiff has waived its right to contest entry of final orders and judgment by this Court in this action by failing to announce, as required by Rule 7008-1 of the Local Rules of the Court, that it does not consent to such treatment in the event the Court determines this action is non-core.  See Murtagh Decl., Ex. J at 23 (Fourth Affirmative Defense); Murtagh Decl., Ex. K at 12 (Defenses).

On a motion to dismiss for judgment on the pleadings under Rule 12(c) – like a motion to dismiss for failure to state a claim under Rule 12(b)(6) – "a trial court 'may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document,'" and the court may do so without converting the motion to a motion for summary judgment. Citisteel USA, Inc. v. Gen. Elec. Co., 78 F. App'x 832, 835 (3d Cir. 2003) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). Thus, when "the allegations of the complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint." Six Flags, Inc. v. Parc Mgmt., LLC (In re Premier Int'l Holdings, Inc.), 443 B.R. 320, 329 n.47 (Bankr. D. Del. 2010) (quotations and citation omitted). A complaint should be dismissed when the documentary evidence conclusively establishes a defense. See Dykes v. Se. Pa. Transp. Auth., 68 F.3d 1564, 1566 n.3 (3d Cir. 1995); Eames, 412 F. Supp. 2d at 435-36.

In the event the Court determines that consideration of a document cited herein requires converting this Motion to one for summary judgment under Federal Rule of Civil Procedure 56, the Court may do so provided that Plaintiff receives notice and a reasonable time to respond with any allegedly relevant additional material. See Fed. R. Civ. P. 12(d). By this Motion, Morgan Stanley and J. Aron have provided Plaintiff with reasonable notice of their request that the Court convert this Motion to a motion for summary judgment if the Court deems that such conversion is necessary. Summary judgment is appropriate in "disputes involving the interpretation of unambiguous contracts," and "[a] contract is unambiguous if it is reasonably capable of only one construction." Tamarind Resort Assocs. v. Gov't of Virgin Islands, 138 F.3d 107, 110-11 (3d Cir. 1998) (quotations and citations omitted).

## ARGUMENT

## POINT I

## WHILE DISALLOWED POST-PETITION INTEREST IS INCLUDED IN THE DEFINITION OF SECURED OBLIGATIONS, IT IS NOT INCLUDED IN THE THIRD PRIORITY OF THE  SECTION 4.1 WATERFALL BECAUSE IT IS NOT DUE AND PAYABLE OR PRESENTLY DUE AND OWING IN THIS CASE

There is no allocation dispute if all TCEH First Lien Creditors are limited to the amount of their claims as of the petition date when all of their debt was accelerated as a matter of law.[12]  While "Secured Obligations" are defined to include interest, whether or not allowed or allowable, a key issue for this Court is whether for purpose of the "<u>third</u>" priority in Section 4.1 of the CAICA any post-petition interest becomes "presently due and owing" and "due and payable" against the Debtors after the petition date.

There is no dispute that the circumstances present here do not permit any allowed claim against the Debtors for post-petition interest by any of the TCEH First Lien Creditors (Plaintiff does not allege otherwise).[13]  Under these circumstances, the plain meaning of the phrases "due and payable" and "presently due and owing" compels the conclusion that any amount attributable to post-petition interest in the definition of Secured Obligations is not actually owing by the Debtors and therefore is not included in the Section 4.1 waterfall.  This construction is also mandated by the bedrock rule of contract construction that the Court is

---

[12] As noted above, such acceleration also contractually occurred for the TCEH First Lien Noteholders under section 6.01(a)(6) of the TCEH First Lien Notes Indenture.

[13] The Bankruptcy Code permits post-petition interest on secured claims only when the value of the collateral exceeds the claim, making the claim oversecured.  11 U.S.C. § 506(b); <u>United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.</u>, Ltd., 484 U.S. 365, 372–73 (1988) ("Since this provision [§ 506(b)] permits postpetition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest.").  It is undisputed the TCEH First Lien Creditors are undersecured.  <u>See</u> DS, Ex. 10 at 6 ("As indicated in the Valuation Analysis attached to the Disclosure Statement, the Holders of TCEH First Lien Secured Claims are significantly undersecured."); <u>see also</u> Plan Art. III.B.29(b) (recognizing that the TCEH First Lien Creditors have deficiency claims in an aggregate amount of $8.1 billion to $9.5 billion); <u>id.</u> Art. III.B.28(b)(ii) (allowing the TCEH First Lien Notes' claims in the amount of $1,815,965,278, which does not include any post-petition interest).

required to read a contract as a whole and give effect to all of its language.  It is also confirmed

by the commercial context in which the contract was negotiated and expected to operate as

evidenced by the specific disclosures made in the 11.5% OM.

1. **Reading The CAICA As A Whole And Giving Effect To The Plain Meaning of All Of Its Provisions Precludes Plaintiff's Attempt To Obtain A Preferential Distribution**[14]

The CAICA, like any other contract, "should be read as a whole" and every

provision should be "interpreted with reference to the whole."  Beal Sav. Bank v. Sommer,

8 N.Y.3d 318, 324 (2007).  "The best evidence of what parties to a written agreement intend is

what they say in their writing." Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002)

(emphasis added) (citations omitted).  "Thus, a written agreement that is complete, clear and

unambiguous on its face must be enforced according to the plain meaning of its terms." Id.  In

ascertaining the plain meaning of an undefined contract term, "[i]t is common practice for the

courts of [New York] to refer to the dictionary."  10 Ellicot Square Court Corp. v. Mountain

Valley Indem. Co., 634 F.3d 112, 120 (2d Cir. 2011) (citations omitted).  In addition, courts

"should not adopt an interpretation which will operate to leave a provision of a contract without

force and effect."  Lamm v. State St. Bank & Tr. Co., 889 F. Supp. 2d 1321, 1328 (S.D. Fla.

2012) (interpreting New York contract law) (quotations and citations omitted).  Applying these

bedrock rules of contract interpretation and construction compels the conclusion that Plaintiff is

not entitled to the preferential distribution it seeks.

First, in interpreting the contract, the Court needs to give meaning to the terms

"presently due and owing" and "due and payable."  Here, dictionary definitions of "due" and

"payable" make clear that, in order to be "due and payable," an amount must be more than just

---

[14] The CAICA is governed by New York Law.  Murtagh Decl., Ex. A § 9.10.

hypothetical or conditional – it must be an actually owing and legally enforceable obligation. Black's Law Dictionary defines "due" primarily as "immediately enforceable" and secondarily as "owing or payable," *Due*, <u>Black's Law Dictionary</u> (10th ed. 2014), and further defines "payable" as an amount "that is to be paid," <u>id.</u> at *Payable*. This is also consistent with how courts have interpreted the phrase "due and payable." <u>In re W. Texas Mktg. Corp.</u>, 155 B.R. 399, 404 (Bankr. N.D. Tex. 1993) (citations omitted) (holding that claims for post-petition interest arising under a state statute were not "due and payable" because, as a matter of bankruptcy law, post-petition interest is only allowed on account of prepetition undersecured claims in a solvent debtor case); <u>see</u> <u>U.S. Bank. Nat'l Ass'n v. Barclays Bank PLC</u>, No. 11 Civ. 9199 (WHP), 2013 WL 1180414, at *5-6 (S.D.N.Y. Mar. 12, 2013) (holding that default for failure to make payment that was "due and payable" did not occur when contractual restrictions legally prevented payor from making such payment); <u>Becker v. North's Rests., Inc.</u>, 967 P.2d 1246, 1251 (Or. Ct. App. 1998) (holding that interest payment payor was legally prohibited from making due to provisions of indenture "may have been due, but . . . was not payable").

In effect, Plaintiff would like to pretend the "third" priority simply reads "(a) all Secured Obligations" instead of "(a) all <u>principal and other amounts then due and payable in respect of</u> the Secured Obligations." Murtagh Decl., Ex. A § 4.1(a) (emphasis added). Plaintiff's construction, which would make the phrase "due and payable" a meaningless redundancy is plainly inconsistent with the well-established contract principles that "an interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." <u>Rothenberg v. Lincoln Farm Camp, Inc.</u>, 755 F.2d 1017, 1019 (2d Cir. 1985) (citations omitted); <u>see also</u> <u>CP III Rincon Towers, Inc. v. Cohen</u>, 13 F. Supp. 3d 307, 319 (S.D.N.Y. 2014) ("[A]n interpretation of

a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." (quoting <u>Galli v. Metz</u>, 973 F.2d 145, 149 (2d Cir. 1992)).

Second, Section 4.1 requires that no distributions be made "until such time as the amount of the Secured Obligations has been determined in accordance with the terms hereof . . . including and subject to <u>Section[] 4.3</u>."    Murtagh Decl., Ex. A § 4.1 (emphasis added). Section 4.3 in turn provides that the Collateral Agent shall make distributions based on "written certification[s] . . . of the aggregate amount of the Secured Obligations then outstanding owed by the [TCEH Obligors to the TCEH First Lien Creditors] . . . to be certified to as <u>presently due and owing</u>."  <u>Id.</u>  § 4.3(b) (emphasis added).   Consistent with Section 4.1, Section 4.3 does not request a certification of all Secured Obligations generally, it requests a certification of the portion of those Secured Obligations "presently due and owing."   Either this phrase is also meaningless, or – as should be assumed, <u>see</u> <u>Rothenberg</u>, 755 F.2d at 1019 – the requirement that Secured Obligations be "then due and payable" and "presently due and owing" limits which Secured Obligations are relevant to determining the amount of a Secured Creditors' pro rata share of Collateral.

Third, the "last" catch-all provision does not use the term "due and payable" and potentially allows for an additional payment to the Secured Obligation of money not "due and payable" by the Debtors to them but based on the distribution of collateral or proceeds received due to the enforcement of turnover rights against second lien creditors.  Indeed, consistent with common commercial practice, the most logical reason why the term "Secured Obligations" is defined in the CAICA to include potentially disallowed claims is to facilitate the enforcement of such turnover rights.  <u>See generally,</u> <u>Report of the Model First Lien/Second Lien Intercreditor</u>

Agreement Task Force, 65 Bus. Law 809, 817-18 n.6 (2010); Ruda, Asset Based Financing:  A

Transactional Guide (Matthew Bender, Vol. 1 2015) § 6.05 [1A](d).

 As set forth above, Section 4.02 of the Second Lien ICA specifically requires the

turnover of "any Shared Collateral or Proceeds thereof received" to the Senior Collateral Agent

for distribution under the CAICA "[s]o long as the Discharge of Senior Obligations has not

occurred."  See Murtagh Decl., Ex. N. § 4.02.[15]  Importantly, Section 1.1 of the CAICA defines

"Discharge of Secured Obligations" in relevant part, as "(d) payment in full in cash of all other

Secured Obligations that are then due and payable or otherwise accrued." (emphasis added).[16]

Thus, if the second lien creditors were to receive any distribution of collateral or proceeds in this

case, they would be required to turnover such property to be distributed by the Collateral Agent

pursuant to the last "priority."[17]  Again, Plaintiff's proposed contract interpretation provides no

explanation for why the term "Secured Obligations" appears in the "last" priority in the CAICA

waterfall.

 Fourth, Morgan Stanley's and J. Aron's reading of these provisions is consistent

with the language in numerous provisions in the CAICA demonstrating that there was no

intention to allow any Secured Creditor to obtain a priority over any other creditor with respect

to their shared collateral except as specifically enumerated in Section 4.1.   Section 2.1, for

example, provides that the Secured Parties are *pari passu* and "no Secured Party shall be entitled

to any preferences or priority . . . (except as otherwise provided in Section 4.1)."  Murtagh Decl.,

---

[15] The Second Lien ICA defines "Discharge of Senior Obligations" to mean "except to the extent otherwise provided in Section 5.06 and 6.05, the 'Discharge of Secured Obligations' as defined in the Senior Intercreditor Agreement." Murtagh Decl., Ex. N § 1.01.

[16] The Bankruptcy Code does not prevent the continued post-petition accrual of interest for purposes of guarantee claims against third party guarantors and subordination claims against junior creditors (or when, as is not contemplated here, the debtor does not obtain any bankruptcy discharge).

[17] Because of the Section 4.3 limitation on the amount of the claims considered for purposes of the Section 4.1 distribution formula to such amount as is "presently due and owing," Plaintiff would also not have obtained a preferential share of any such distribution based on its claimed higher interest rate. See  Murtagh Decl., Ex. A § 4.3.

Ex. A § 2.1.  The reference to the exceptions in 4.1 was plainly intended to refer to the four explicitly enumerated priorities in that section.

Finally, Section 5.6 of the CAICA requires "Additional Obligations" such as the TCEH First Lien Notes to be treated "in the same manner as the other Secured Parties" and to be "secured by a First Lien equally and ratably with all previously existing and future Secured Obligations."  Murtagh Decl., Ex. A § 5.6.  The term "equally and ratably," which is commonly used in negative pledge clauses also has a well-established commercial meaning, which is also inconsistent with the preferential entitlement requested by Plaintiff.  "As its moniker indicates, under the sharing clause collateral is to be shared <u>equally and ratably</u>.  In this context, 'equal' is generally understood to mean that the lien granted to the target debt must be equal in rank to that granted to the triggering debt (the credit agreement).  'Ratable' means that the benefits of the collateral (the proceeds) are applied proportionately to the secured parties."  Richard Wright, et. al., The LSTA's Complete Credit Agreement Guide, 347 (McGraw Hill 2009) (emphasis in original).[18]

Plainly, the original parties to the CAICA expected that these provisions would ensure that in a situation where it was necessary to look to shared collateral for repayment, all First Lien Creditors would be on an equal footing and no such creditor would be required to accept less than what it was otherwise legally entitled to receive in order for another creditor to receive extra compensation for an unenforceable contractual claim against the Obligor Debtors.  See <u>Greenwich Capital Fin. Prod., Inc. v. Negrin</u>, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially

---

[18] The CAICA requires that "Additional Obligations" be permitted under the Credit Agreement.  Murtagh Decl., Ex. A §§ 1.1, 5.6.  Under the Credit Agreement, the TCEH Obligors are permitted only to incur "Permitted Other Notes," which is defined to mean "senior secured notes . . . which notes, if secured, <u>may either have the same lien priority as the Obligations or may be secured by a Lien ranking junior to the Lien securing the Obligations</u>."  Murtagh Decl., Ex. D § 1.1 (emphasis added); <u>id.</u> § 10.2.

unreasonable or contrary to the reasonable expectations of the parties." (quoting In re Lipper Holdings, LLC, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003))).

## 2. **The OM Further Confirms That Post-Petition Interest Is Not "Due And Payable"** [19]

The OM further confirms that post-petition interest is not due and payable.  The OM states explicitly that noteholders will be secured "equally and ratably" with all other TCEH First Lien Creditors, Murtagh Decl., Ex. B at 9, and that in the event of a TCEH bankruptcy filing in which it is determined that the TCEH First Lien Creditors are undersecured, post-petition interest will not "accrue" or be "payable," id. at 24 ("[I]f at the time of the filing the value of the Collateral is less than the amount of principal and accrued and unpaid interest on the notes, and other debt secured by liens on the Collateral that are equal and ratable with the liens securing the notes, interest may cease to accrue on the notes thereafter.") (emphasis added); see also id. at 55 ("The Bankruptcy Code permits only the payment and/or accrual of post-petition interest . . . to the extent the value of the Collateral is determined by the bankruptcy court to exceed the aggregate outstanding principal amount at maturity of the obligations secured by the Collateral.") (emphasis added).  In addition, although the OM presumably would have trumpeted the special protection that Plaintiff alleges the TCEH First Lien Noteholders obtained under the CAICA, the OM does not express or imply that TCEH First Lien Noteholders will obtain any preferential treatment, relative to other TCEH First Lien Creditors, in the event of a bankruptcy filing due to their higher interest rates or otherwise.

---

[19] Reference to the OM is appropriate here – even in the absence of any ambiguity in the CAICA – because it must be read together as part of a group of "writings that form part of a single transaction," namely the OM, the TCEH First Lien Notes Indenture, the Accession Agreement, and the CAICA, "[that] are designed to effectuate the same purpose," namely, creation of the TCEH First Lien Notes and their joinder to the CAICA, "even though they were executed on different dates and were not all between the same parties."  Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2d Cir. 1965) (citing Kurz v. United States, 254 F.2d 811, 812 (2d Cir. 1958) and Nau v. Vulcan Rail & Constr. Co., 36 N.E.2d 106, 110 (N.Y. 1941)).

## POINT II

### THE SECTION 4.1 WATERFALL DOES NOT APPLY
### TO THE DEBTORS' MONTHLY PAYMENTS OF ADEQUATE
### PROTECTION OR TO PLAN DISTRIBUTIONS

**1.  Section 4.1(a) Of The CAICA Does Not Apply To The Monthly Payments**

Section 4.1 of the CAICA clearly and unambiguously provides that the Collateral

Agent must first exercise remedies under the Security Documents before the collateral

enforcement waterfall of Section 4.1(a)(3) is applied.  Murtagh Decl., Ex. A § 4.1.[20]  Plaintiff

baldy asserts that the "Cash Collateral Order reflects and constitutes an exercise of remedies with

respect to the Monthly Payments by the First Lien Collateral Agent under the ICA and the

Security Documents."  Murtagh Decl., Ex. C ¶ 58.  This allegation is plainly incorrect and fails

to state a claim for several reasons.

First, the receipt of adequate protection payments is not an enforcement or

exercise of any remedies.  It is the exact opposite.  Courts have consistently held that adequate

protection is granted to creditors in lieu of creditors exercising any remedies or rights with

respect to their collateral.  See Magnolia Portfolio, LLC v. Dye (In re Dye), 502 B.R. 47, 54-56

(Bankr. M.D. Pa. 2013) (differentiating adequate protection from the exercise of any rights or

remedies with respect to collateral); In re Deico Electronics, 139 B.R. 945, 947 (B.A.P. 9th Cir.

1992) (noting that adequate protection is provided "because of the delay that bankruptcy works

---

[20] Section 4.1 is intended to apply to instances in which the Collateral Agent itself has marshaled Collateral through a foreclosure or a collection on accounts upon a foreclosure.  The parties' intent regarding Section 4.1 is further evidenced by references in Section 4.1 to specific remedies, such as collections on Collateral, and sales and dispositions of Collateral.  The use of such terms mirrors the remedial provisions in the Security Agreement which is referred to in Section 4.1 and pertains to the Collateral Agent's ability to foreclose on Collateral.  See Murtagh Decl., Ex. L § 5.1 (granting Collateral Agent the right to collect on accounts after providing notice to the debtor); id. § 5.5 (discussing Collateral Agent's exercise default remedies, including specifically its ability to foreclose on and sell Collateral under the Uniform Commercial Code).  Other remedial provisions in the Security Agreement likewise contemplate the Collateral Agent's ability to foreclose on Collateral and to marshal assets subject to the TCEH First Lien Creditors' lien.  See id. § 5.4 (discussing application of proceeds upon a collection on accounts, or upon a sale of the Collateral by the Collateral Agent); id. § 5.6 (noting that Grantors are liable for any deficiency resulting from a sale of Collateral by the Collateral Agent).

on the exercise of [a creditor's] state law remedies."). The established purpose of adequate protection is to compensate secured creditors against any diminution in value of their collateral caused by the "restraint of lien enforcement by a bankruptcy court." Del. Valley Sav. & Loan Ass'n v. Curtis (In re Curtis), 9 B.R. 110, 112 (Bankr. E.D. Pa. 1981); see Pistole v. Mellor (In re Mellor), 734 F.2d 1396, 1400 (9th Cir. 1984); Kelley v. Embrey (In re Embrey), 56 B.R. 626, 628 (Bankr. W.D. Mo. 1986) ("[P]reconfirmation adequate protection is to protect against delay in the enforcement of a secured creditor's rights and to compensate the 'lost opportunity' interest.").[21]

Thus, even though a creditor may be "stripped of the right to immediate possession of [their] property, the creditor receives assurances that the value it could have received through foreclosure will not decline." Sec. Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC), 314 B.R. 436, 441-42 (B.A.P. 9th Cir. 2004) (citation and quotations omitted); see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 369-70 (1988). Adequate protection is merely a form of compensation provided by a debtor, which is provided in lieu of the creditor enforcing its lien on pre-petition collateral and to protect against a diminution in value of the collateral during the pendency of the chapter 11 case. See, e.g., In re Satcon Tech. Corp., No. 12-12869 KG, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); In re Curtis, 9 B.R. at 112; In re Panther Mountain Land Dev., 438 B.R. 169, 189 (Bankr. E.D. Ark. 2010). As one court has stated: "Though a debtor continues to *use* the

---

[21]    See also Travelers Ins. Co. v. Plaza Family P'ship (In re Plaza Family P'ship), 95 B.R. 166, 171 (E.D. Cal. 1989); In re NMP Concord II, LLC, No. 10-43080 EDJ, 2010 WL 3488249, at *4 (Bankr. N.D. Cal. Sept. 1, 2010); In re Holliday, No. 11-62315-13, 2012 WL 1579241, at *5 (Bankr. D. Mont. May 4, 2012); In re The Lodge at Big Sky, LLC, 454 B.R. 138, 144 (Bankr. D. Mont. 2011); In re Holt, No. 09-62439-13, 2010 WL 3294693, at *5 (Bankr. D. Mont. Aug. 20, 2010); In re BLX Grp. Inc., 419 B.R. 457, 470 (Bankr. D. Mont. 2009); In re Rizzotto, No. 09-6096511, 2009 WL 2477232, at *4 (Bankr. D. Mont. Aug. 11, 2009); In re Saarel, No. 08-61684-11, 2009 WL 1941735, at *7 (Bankr. D. Mont. July 2, 2009); In re Steve Cavanaugh Ltd. P'ship, No. 08-61002-11, 2009 WL 1323834, at *5 (Bankr. D. Mont. Apr. 29, 2009); In re Eskim, LLC, No. 08-509, 2008 WL 4093574, at *2 (Bankr. N.D. W. Va. Aug. 28, 2008); LNC Invs., Inc. v. First Fidelity Bank, 247 B.R. 38, 50 n.7 (S.D.N.Y. 2000).

lender's collateral during the case and prior to the plan, adequate protection is provided (e.g., pursuant to section 362(d)) <u>in lieu of enforcement of the Lender's remedies</u>." <u>In re Stembridge</u>, 287 B.R. 658, 662 n.10 (Bankr. N.D. Tex. 2002) (underlined emphasis added), <u>rev'd on other grounds</u>, 394 F.3d 383 (5th Cir. 2004).  Thus, in no way can adequate protection payments be equated with the exercise of any default related rights or remedies.  <u>See</u> <u>In re Stembridge</u>, 394 F.3d 383, 387 (5th Cir. 2004) ("This is the tradeoff the automatic stay creates for creditors and debtors:  creditors are prevented from seizing their secured assets in order to provide debtors with 'breathing room' to reorganize; in return, the creditors' present value is preserved throughout the reorganization through adequate protection.").

Second, Section 6.1 of the CAICA specifically addresses the Collateral Agent's ability to consent to adequate protection, priming liens and the use of cash collateral.  The FAC does not even refer to Section 6.1, let alone address it.[22]  Significantly, this provision, which requires that TCEH First Lien Creditors receive materially equal treatment with respect to adequate protection, further confirms that the parties never viewed adequate protection and the consent to the use of cash collateral as an enforcement of any remedies.  Indeed, Section 6.1 provides that in the case of an insolvency proceeding where the Collateral Agent (acting at the direction of the requisite creditors) desires to "permit the use of '<u>Cash Collateral</u>' (as such term is defined in Section 363(a) of the Bankruptcy Code)" on which any creditor has a lien or to permit the Debtors to obtain DIP financing, no party to the CAICA is permitted to object so long as the

---

[22] Under New York law, which governs the CAICA, a specific provision in a contract will control and govern over a more general provision.  <u>See</u> <u>Muzak Corp. v. Hotel Taft Corp.</u>, 133 N.E.2d 688, 690 (N.Y. 1956); <u>Capital Ventures Int'l v. Republic of Arg.</u>, 652 F.3d 266, 271 (2d Cir. 2011) (New York contracts are subject to the "common (and commonsensical) rule that a specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision"); <u>see also</u> <u>Barclays Capital Inc. v. Giddens (In re Lehman Bros. Holdings Inc.)</u>, 761 F.3d 303, 313 (2d Cir. 2014) ("To the extent that there appears to be a conflict between these provisions, the specific governs the general."), <u>cert. denied</u>, 135 S. Ct. 2048 (2015).

terms of the adequate protection granted to the parties "provide for <u>materially equal treatment</u> to all Secured Parties."  Murtagh Decl., Ex. A § 6.1 (emphasis added).

Plaintiff's *ipse dixit* allegation that the collateral enforcement waterfall applies to adequate protection payments is directly contradicted by the plain language of Section 6.1, which does not refer to Section 4.1 at all.  If the parties had intended the adequate protection payments to be considered "Collateral" or "proceeds thereof" received upon an enforcement action by the Collateral Agent, and distributed in accordance with the collateral enforcement waterfall, at a minimum, Section 6.1 would have incorporated or at least cross referenced Section 4.1.  Instead, the more specific Section 6.1 expressly references materially equal treatment for the allocation of Monthly Payments and the use of cash collateral, while the provisions of Section 4.1 are silent with respect to adequate protection.

Third, the waterfall in Section 4.1 of the CAICA is expressly limited to instances when payments of Collateral or the proceeds thereof are made by the Collateral Agent.  <u>See</u> Murtagh Decl., Ex. A §§ 4.1, 4.2.  Thus, even if the Monthly Payments were deemed to be Collateral or proceeds of Collateral, Section 4.1 still would not apply because, pursuant to the Cash Collateral Order, the adequate protection payments are made by the Debtors directly to the TCEH First Lien Creditors, not to the Collateral Agent.

If the parties to the CAICA had intended adequate protection payments to be paid to or subject to turnover in favor of all TCEH First Lien Creditors, they clearly knew how to effect such a result as they did in the Second Lien ICA.  <u>See</u> Murtagh Decl., Ex. N §§ 4.01, 4.02 ("turnover" provisions requiring that the waterfall in that agreement shall apply to monies paid directly to the second lien creditor).  The absence of any comparable turnover provision in the CAICA further demonstrates that the enforcement waterfall in Section 4.1 does not apply to the

Monthly Payments at issue here.  See Sterling Inv'r Servs., Inc. v. 1155 Nobo Assocs., LLC, 818 N.Y.S.2d 513, 516 (App. Div. 2006) ("Under accepted canons of contract construction, when certain language is omitted from a provision but placed in other provisions, it must be assumed that the omission was intentional.").

### 2.  Section 4.1(a) Of The CAICA Does Not Apply To The Plan Distributions

The Plan Distributions also are not subject to Plaintiff's proposed reallocation under the Section 4.1 waterfall of the CAICA because they also will not result from the Collateral Agent's exercise of remedies, nor will they constitute the proceeds of any Collateral.

### A.  The Plan Distributions Are Not The Result Of An "Exercise Of Remedies" By The Collateral Agent

As conceded by Plaintiff in the FAC, it is unequivocal that the enforcement waterfall in Section 4.1 only applies in instances where the Collateral Agent has first exercised remedies under the Security Documents (as defined in the CAICA).  Plaintiff erroneously claims that the Collateral Agent has exercised remedies because (i) the Collateral Agent has the exclusive right to make determinations with respect to the Collateral under Sections 5.1 and 7.8 of the CAICA, (ii) the Plan Support Agreement ("PSA") constitutes an exercise of remedies by the Collateral Agent, and (iii) the discharge of the TCEH First Lien Creditors' liens constitutes an exercise of remedies.  Murtagh Decl., Ex. C ¶¶ 55-57, 59.  However, these naked allegations fail to state a claim and, on that basis alone, the FAC should be dismissed.  See Papasan v. Allain, 478 U.S. 265, 286 (1986) (a court is not bound to accept as true "a legal conclusion couched as a factual allegation"); In re MPM Silicones, LLC, 518 B.R. 740, 750 (Bankr. S.D.N.Y. 2014) (granting Rule 12(c) motion because plaintiff's claims that defendants exercised remedies were based on conclusory allegations) ("Momentive").

As a threshold matter, Section 4.1 plainly does not apply generally to all distributions made in a bankruptcy case, and applies only to proceeds received in connection with an exercise of remedies <u>by the Collateral Agent</u> under the Security Documents.  Consistent with this interpretation of the CAICA, the Task Force for the Model Intercreditor Agreement observed that waterfall provisions in intercreditor agreements – notably Section 4.1 is substantially similar to Model Intercreditor Agreement's section 4.1 – "<u>do[] not apply to payments or other distributions made in an insolvency proceeding unless those payments or other distributions are received in connection with an enforcement action</u>."  The Committee on Commercial Finance, <u>Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force</u>, 65 Bus. Law. 809, 845 n. 41 (2010) (emphasis added).[23]  Like the provisions in the Model Intercreditor Agreement, the CAICA waterfall is also not triggered unless there is an enforcement action by the Collateral Agent.

Plaintiff fails to offer a single nonconclusory allegation that the Distributions under the Plan are the result of the Collateral Agent's exercise of remedies.  Instead, Plaintiff simply assumes that the treatment of the Collateral and release of liens under the Plan are remedies under the CAICA, and therefore the Collateral Agent – who alone is empowered to exercise remedies under the CAICA and other security documents – must be enforcing remedies.  <u>See</u> Murtagh Decl., Ex. C ¶¶ 55, 59.  However, the CAICA neither defines the term "remedies" nor provides a list of remedies.  The documents that do – the Security Agreement and the Pledge Agreement, dated as of October 10, 2007, amended and restated as of August 7, 2009 (the

---

[23] The preamble to section 4.1 of the Model Intercreditor Agreement similarly provides that "[u]ntil the Discharge of First Lien Obligations and the Discharge of Second Lien Obligations, and regardless of whether an Insolvency Proceeding has been commenced, Collateral or Proceeds <u>received in connection with an Enforcement Action</u>" will be applied in accordance with the order specified therein.  The Committee on Commercial Finance, <u>Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force</u>, 65 Bus. Law. 809, 845-46 (2010) (emphasis added).

"<u>Pledge Agreement</u>") – make no mention of any act taken in relation to a bankruptcy proceeding. <u>See</u> Murtagh Decl., Ex. L § 5.5; Murtagh Decl., Ex. O § 12.  The remedies referenced in those documents <u>and</u> in the portion of the CAICA to which Plaintiff looks for the Collateral Agent's exclusive enforcement authority, refer only to the Collateral Agent's powers of foreclosure.  <u>See</u> Murtagh Decl., Ex. A § 7.8; Murtagh Decl., Ex. L §§ 5.1, 5.5; Murtagh Decl., Ex. O § 12.  Thus, Plaintiff's conclusory allegation is plainly refuted by the actual, and undisputed, facts.

Plaintiff's allegation that signing a PSA constitutes an exercise of remedies by the Collateral Agent has previously been tried, but, unsurprisingly, failed.  <u>See</u> <u>Momentive</u>, 518 B.R. at 750.  In <u>Momentive</u>, certain senior creditors contended that junior creditors violated the terms of an intercreditor agreement by exercising remedies – particularly, the objection to senior creditors' makewhole claims and the support of the debtors' chapter 11 plan.  518 B.R. at 746. The Bankruptcy Court for the Southern District of New York, in granting the motion of the defendants to dismiss pursuant to Rule 12(c), concluded that such actions did not qualify as an exercise of remedies.  <u>See</u> <u>id.</u> at 750.  <u>Momentive</u> applies here with full force.

Moreover, nothing in the PSA obligates the Collateral Agent to foreclose on Collateral or to collect on the Debtors' accounts.  Indeed, the Collateral Agent is only deemed to be a party to the PSA in limited circumstances.  <u>See</u> Murtagh Decl., Ex. P at 4 (noting that the Collateral Agent is only a "Party" to the PSA with respect to sections 6.1 and 12.4).  Further, the Collateral Agent is not obligated to support the chapter 11 plan or to consent to any of the transactions thereunder.  <u>See</u> <u>id.</u> § 4.1 (noting that only the "Consenting TCEH Creditor Parties"

are obligated to support and vote in favor of the plan).[24]  Consequently, nothing in the PSA indicates that the Collateral Agent has enforced any remedies with respect to the Collateral.

Plaintiff's allegation that the discharge of the TCEH First Lien Creditors' liens under the plan of reorganization constitutes an exercise of remedies is similarly flawed.  Under the Debtors' Plan, the Collateral Agent is not responsible for taking any affirmative actions in connection with the effectuation of the release of the TCEH First Lien Creditors' liens.  Rather, the Plan provides that on the effective date of the plan and upon distributions to secured creditors equal to the allowed amount of such secured claims, "all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be released and discharged, and all of the right, title, and interest of any Holder of [such liens] . . . shall revert to the Reorganized Debtors and their successors and assigns . . . ."  See Plan Art. VIII.B. Accordingly, the lien is released automatically under the Plan, without the need for the Collateral Agent or the TCEH First Lien Creditors to release or otherwise consent to the release of their liens.  See id.  Therefore, there is no basis for Plaintiff's allegation that the Collateral Agent is enforcing any remedies so as to trigger Section 4.1 when the Plan does not contemplate that the Collateral Agent will have any active role in the lien release process.

Similarly, Plaintiff erroneously contends that any release of liens on Collateral must be effectuated by the Collateral Agent, which, according to Plaintiff, has the exclusive right to release liens and dispose of Collateral under sections 5.1 and 7.8 of the CAICA.  Once again, Plaintiff's claim is contradicted by the terms of the CAICA, which expressly provides that the "Collateral Agent, the Administrative Agent, each Secured Commodity Hedge Counterparty and each other Secured Party and any of them may" (i) alter the lien on any collateral, (ii) sell,

---

[24] The provisions applicable to the Collateral Agent in the PSA merely provide that the Collateral Agent will refrain from supporting an alternative restructuring and will agree to adjourn the adjudication of the official committee's standing motions.  See Murtagh Decl., Ex. P § 6.1.

release, or surrender any Collateral, (iii) settle or compromise any Secured Obligation and any security therefor, and (iv) exercise or refrain from exercising any remedy against the TCEH Obligors.  See Murtagh Decl., Ex. A § 3.1(d) (emphasis added).[25]  Plaintiff's bald assertion that the Collateral Agent has exercised remedies simply because it has the right to exercise remedies is a non sequitur.  Quite obviously, the impact of the Plan on the TCEH First Lien Creditors' claims and liens is driven by the Bankruptcy Code, not the CAICA or other Security Documents.

### B.   The Plan Distributions Are Not Proceeds Of Collateral

Plaintiff alleges that the Distributions are "in connection with the sale or other disposition of, or collection on," the TCEH First Lien Creditors' Collateral,  Murtagh Decl., Ex. C ¶ 51 (paraphrasing UCC 9-102(a)(64)), because such Collateral is being "transferred" to Reorganized TCEH, which will then distribute stock, id. ¶ 52.  This is an oversimplification of an extremely complex reorganization, the precise contours of which may not have been set. Nevertheless, based on what is pleaded, this is similar to the situation that Judge Drain confronted in Momentive, where he held that new equity issued by the reorganized entity owning the secured creditors' collateral was not proceeds of that collateral.  See Momentive, 518 B.R. at 754.

While, unlike Momentive, the collateral rights of the TCEH First Lien Creditors will be extinguished, the critical similarity is that the property that constitutes the collateral itself will remain with the reorganized debtors.  There is no third-party purchaser here.  The business is not being sold.  This necessarily means that (a) the Collateral is not being distributed under the Plan and (b) no proceeds will be created.  See Momentive, 518 B.R. at 755 ("To give the term 'proceeds' a coherent, functional meaning, one must define that term to include all assets

---

[25] Moreover, the TCEH First Lien Creditors "may take any actions and exercise any and all rights that they would have as an unsecured creditor."  Murtagh Decl., Ex. A § 3.1(b).

received upon the occurrence of events that exhaust the collateral's economic value or productive capacity." (quoting R. Wilson Freyermuth, <u>Rethinking Proceeds: The History, Misinterpretation and Revision of U.C.C. Section 9–306</u>, 69 Tul. L. Rev. 645, 707 (1995))); <u>id.</u> at 756 ("A secured creditor is not getting the proceeds of its collateral when it gets stock in the reorganized entity, unless, of course, that stock was paid by a third-party buyer in return for the debtor's assets comprising the collateral."). Stated another way, the Plan treatment of the TCEH First Lien Creditors' claims is simply a product of the Bankruptcy Code. Because the Plan Distributions are not proceeds of Collateral, the waterfall in Section 4.1 of the CAICA cannot apply.[26]

---

[26] The Bankruptcy Code's prohibition on the use of a distribution of "equity" to achieve a section 1129(b) cramdown of secured debt further confirms that equity in the reorganized debtor is not a substitute for, or the equivalent of, pre-petition collateral and therefore cannot be the proceeds of collateral. <u>See</u> <u>Momentive</u>, 518 B.R. at 756 ("[I]f the stock were collateral proceeds to which the creditor's lien would attach, it would not be substitute collateral appropriate for analysis under the "indubitable equivalent" cramdown alternative in section 1129(b)(2)(A)(iii)."); <u>see also</u> <u>In re Pacific Lumber Co.</u>, 584 F.3d 229, 246 (5th Cir. 2009) (expressing doubt that equity securities can be the "indubitable equivalent" of secured claims).

## <u>CONCLUSION</u>

For the foregoing reasons, Morgan Stanley and J. Aron respectfully request that this Court: (1) grant their Motion for judgment on the pleadings to dismiss the FAC with prejudice pursuant to Federal Rule of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12(c) or, in the alternative, to grant summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56; (2) order that all Distributions due to the TCEH First Lien Creditors under the Plan be made to the Secured Debt Representatives (as defined in the Plan) to be distributed Pro Rata (as defined in the Plan) to each of the TCEH First Lien Creditors on the Effective Date (as defined in the Plan); (3) order that all Holdback Amounts escrowed under the Cash Collateral Order be released to the Secured Debt Representatives (as defined in the Plan) to be distributed Pro Rata (as defined in the Plan) to each of the TCEH First Lien Creditors within five (5) business days of entry of this order, and that no amounts shall be deducted as Holdback Amounts from any future Monthly Payments; and (4) grant any other relief as the Court deems just and appropriate.

Dated: Wilmington, Delaware
       October 9, 2015


Respectfully submitted,

COZEN O'CONNOR

By: */s/ Simon E. Fraser*

Mark E. Felger (No. 3919)
Simon E. Fraser (No. 5335)
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2011
Fascimile: (215) 701-2260
Email: mfelger@cozen.com
Email: sfraser@cozen.com

-AND-

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
Thomas J. Moloney (admitted *pro hac vice*)
Sean A. O'Neal (admitted *pro hac vice*)
Humayun Khalid (admitted *pro hac vice*)
Hugh K. Murtagh (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Email: tmoloney@cgsh.com
Email: soneal@cgsh.com
Email: hkhalid@cgsh.com
Email: hmurtagh@cgsh.com

*Counsel for J. Aron & Company*

DLA PIPER LLP (US)

By: */s/ Ashley R. Altschuler*

Ashley R. Altschuler (No. 3803)
R. Craig Martin (No. 5032)
Scott Czerwonka (No. 4844)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
ashley.altschuler@dlapiper.com
craig.martin@dlapiper.com
scott.czerwonka@dlapiper.com

-AND-

CADWALADER, WICKERSHAM & TAFT LLP
Howard R Hawkins, Jr. (admitted *pro hac vice*)
Ellen M. Halstead (admitted *pro hac vice*)
Michele Maman (admitted *pro hac vice*)
Thomas J. Curtin (admitted *pro hac vice*)
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
howard.hawkins@cwt.com
ellen.halstead@cwt.com
michele.maman@cwt.com
thomas.curtin@cwt.com

Mark C. Ellenberg (admitted *pro hac vice*)
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
mark.ellenberg@cwt.com

*Counsel for Morgan Stanley Capital Group Inc.*