# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS | ) | Case No. 14-10979 (CSS) |
| CORP., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| DELAWARE TRUST COMPANY, as | ) | |
| TCEH First Lien Indenture Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No: 15-51239(CSS) |
| | ) | |
| WILMINGTON TRUST, N.A., as First Lien | ) | |
| Collateral Agent and First Lien Administrative | ) | |
| Agent, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MORGAN STANLEY CAPITAL GROUP INC., | ) | |
| J. ARON & COMPANY, and TITAN | ) | |
| INVESTMENT HOLDINGS LP, | ) | |
| | ) | |
| Intervenors. | ) | |

## OPINION[1]

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Dated: March 11, 2016

Sontchi, J. _____

# INTRODUCTION[2]

There are 3 different types of TCEH First Lien Creditors in this adversary proceeding – each with a different interest rate.  The First Lien Noteholders have the highest interest as between and among the other TCEH First Lien Creditors.  Even though the First Lien Creditors, as a whole, are undersecured and not entitled to post-petition interest from TCEH, the First Lien Noteholders assert that post-petition interest should accrue on the respective pieces of First Lien Debt for purposes of allocating payments between and among the First Lien Holders (referred to herein as the "Postpetition Interest Allocation Method").  The other two groups of First Lien Holders (referred to herein as the "Non-Noteholders" or the "Intervenors") do not agree and believe that the money should be allocated on a *pro rata* basis based on the amounts owed as of the Petition Date (referred to herein as the "Petition Date Allocation Method").

These arguments lay in the language of the Intercreditor Agreement[3] and the Security Agreement,[4] as well as the Cash Collateral Order entered by this Court.  There

---

[2]  Capitalized terms not defined herein shall have the meaning ascribed to them *infra*.

[3]  *Declaration of Hugh K. Murtagh* (D.I. 58) (the "Murtagh Dec."), Exh. A (Amended and Restated Collateral Agency and Intercreditor Agreement, dated Oct. 10, 2007 (as later amended and restated) (hereinafter, the "Intercreditor Agreement")).

[4]  Murtagh Dec., Exh. L (Security Agreement) (hereinafter the "Security Agreement")).

are two "buckets" of value at issue: (i) the Adequate Protection Payments distributed per the Cash Collateral Order; and (ii) upcoming Plan Distributions. The parties estimate that there is up to a $90 million delta between the Post-Petition Interest Allocation Method and the Petition Date Allocation Method.

## JURISDICTION

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be so in the context of this adversary proceeding. This is a core proceeding pursuant to 11 U.S.C. § 157(b) and the order and opinion in *Delaware Trust Company v. Wilmington Trust, N.A.*, 534 B.R. 500 (S.D.N.Y. 2015) (as discussed in more detail below).

## BACKGROUND

### A.    General Background Related to Bankruptcy Case

On April 29, 2014 (the "Petition Date"), Texas Competitive Electric Holdings ("TCEH") and its parent Energy Future Competitive Holdings ("EFCH," collectively with TCEH and its debtor subsidiaries, the "TCEH Debtors") and certain affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.

**B.      Procedural History of Adversary Action**

On March 13, 2015, Delaware Trust Company (the "First Lien Trustee," "DTC," or the "Collateral Agent") initiated an action in New York state court (the "First Lien Noteholder Action").  The First Lien Noteholder Action sought a declaratory judgment that the Adequate Protection Payments should be allocated under the Postpetition Interest Allocation Method for the benefit of the First Lien Noteholders and sought specific performance directing the escrow agent to turn over the Adequate Protection Payments to the First Lien Trustee for the benefit of the First Lien Noteholders.  While in state court, the Intervenors filed their respective motions to intervene in the proceedings.

On April 14, 2015, Wilmington Trust, N.A., as First Lien Administrative Agent ("Wilmington Trust"), removed the First Lien Noteholder Action to the United States District Court for the Southern District of New York (the "SDNY").  Thereafter, the First Lien Trustee moved to remand the case to state court and Wilmington Trust moved to transfer venue to this Court.  The Intervenors also filed a joint motion to transfer this case to this Court.  On July 23, 2015, the SDNY court issued an opinion denying the First Lien Trustee's motion to remand and granting Wilmington Trust's motion to transfer venue.[5] As a result, this adversary proceeding was transferred to this Court.

After venue was transferred and the Debtors filed the plan that was subsequently confirmed (as amended), the First Lien Trustee filed its first amended complaint (the

---

[5] *Delaware Trust Co. v. Wilmington Trust, N.A.*, 534 B.R. 500 (S.D.N.Y. 2015).

"First Amended Complaint") asserting that both the Adequate Protection Payments and the Plan Distributions should be subject to the Postpetition Interest Allocation Method.[6] The First Amended Complaint also asserts that the Bankruptcy Court lacks authority to enter a final order or judgment in the action.[7]

Thereafter, three dispositive motions were filed. First, intervenors Morgan Stanley Capital Group Inc. ("Morgan Stanley") and J. Aron & Company[8] ("J. Aron") filed a joint motion for judgment on the pleadings (the "Morgan Stanley/J. Aron Motion") seeking a judgment that the Petition Date Allocation Method is the appropriate method for dividing the Adequate Protection Payments and the Plan Distributions between and among the First Lien Creditors.[9]

Second, intervenor Titan Investment Holdings L.P.[10] ("Titan") filed a motion for judgment on the pleadings (the "Titan Motion") also seeking judgment that the Petition Date Allocation Method is the appropriate method for division between and among the First Lien Creditors.[11]

---

[6]  Adv. D.I. 15-51239, D.I. 30.

[7]  First Amended Complaint ¶ 15 n. 8.

[8]  Morgan Stanley (approximately, $225 million) and J. Aron (approximately, $950 million), together, hold the majority of the swap debt. *Delaware Trust Co.*, 534 B.R. at 506.

[9]  Adv. D.I. 56 (motion), 57 (brief in support), and the Murtagh Dec.

[10]  Titan holds approximately $50 million of First Lien Bank Debt. *Delaware Trust Co.*, 534 B.R. at 506.

[11]  Adv. D.I. 60 (motion) and 61 (brief in support).

Third, plaintiff DTC filed a motion for partial judgment on the pleadings, and in the alternative a motion for partial summary judgment[12] (the "DTC Motion," and collectively with the Morgan Stanley/J. Aron Motion and the Titan Motion, the "Motions") seeking a judgment that the Post-Petition Interest Allocation method is appropriate (such allocation would give the Noteholders a larger share of the Adequate Assurance Payments and Plan Distributions).

All three Motions are fully briefed and are ripe for the Court's consideration.

Additionally, defendant Wilmington Trust filed a reservation of rights.[13] Wilmington Trust does not take any position as to the allocation dispute at issue in the Motions; however, Wilmington Trust reserves its rights relating to the calculation of amounts to be distributed between and among the First Lien Creditors if the Court concludes that the Postpetition Interest Allocation Method (i.e. DTC's asserted calculation) should be applied to Adequate Protection Payments and Plan Distributions.

The Court heard oral argument on the Motions on March 4, 2016.  At the conclusion of the argument the Court took these Motions under advisement.  This is the Court's decision thereon.

## C.    The First Lien Noteholder Action in SDNY

In March 2015, DTC filed a contract action to resolve the allocation dispute in the New York State Supreme Court.  Wilmington Trust removed the case to SDNY.  Titan,

---

[12]  Adv. D.I. 62.

[13]  Adv. D.I. 55.

Morgan Stanley and J. Aron (collectively, the "Intervenors") sought to intervene in that

action and, along with Wilmington Trust, sought to transfer the matter from SDNY to

this Court (at the same time, DTC sought to remand the action back to New York state

court).  The SDNY court granted the Intervenors' (respective) motions to intervene and

found that that the dispute "arises in" the TCEH bankruptcy proceeding and is, thus, a

core proceeding.[14]  Specifically, the SDNY court held:

> Claims like those here that by their nature can emerge only in
> a bankruptcy proceeding are "arising in" claims under
> § 1334(b).  And here, unlike in many other cases where
> "arising in" jurisdiction is found, the bankruptcy statutes
> themselves explicitly give rise to this controversy, as they
> treat matters pertaining to the use of cash collateral and
> adequate protection payments as core proceedings.  In sum,
> because the present dispute could only have arisen in
> connection with a bankruptcy proceeding, it is a core
> proceeding.
>
> Second, the present dispute among creditors will affect the
> allocation of money currently in the Debtors' coffers, and the
> allocation of such money is itself a core bankruptcy function.
> To be sure, money previously paid into escrow is outside the
> bankruptcy estate. But Delaware Trust, the plaintiff, seeks a
> declaration, and specific performance, that all past and future
> monthly adequate protection payments be allocated based on
> the Postpetition Allocation Method.   In other words,
> Delaware Trust wants all future adequate protection
> payments—funds currently in the Debtors' coffers—to be
> allocated pursuant to its preferred method.  In light of this
> request for relief, the present dispute unavoidably affects
> current property of the Debtors' estate. And because it
> directly bears on the distribution of the Debtors' current
> property, this controversy "concern[s] the administration of

---

[14] *Delaware Trust Co.*, 534 B.R. at 505.

the estate" by the Bankruptcy Court, which in turn is a core bankruptcy function under 28 U.S.C. § 157(b)(2)(A). Delaware Trust is myopic when it argues that the funds at issue in this dispute "are not property of any bankruptcy estate," . . . as it ignores that the relief it seeks based on its reading of the Intercreditor Agreement is—and inherently must be—both retrospective and prospective in nature.

Third, although Delaware Trust characterizes this matter as merely a contract dispute, the case law makes clear that a contract dispute can be core to bankruptcy proceedings depending on its nature, and the nature of the dispute here makes it a core bankruptcy dispute.

. . .

The present dispute is therefore particular to and "uniquely affected by" this bankruptcy.

. . .

Fourth, it appears that the court that resolves the allocation dispute may be called upon to consider the interaction between provisions of the Intercreditor Agreement and bankruptcy law and principles. [15]

Thereafter, the SDNY court transferred the adversary proceeding to this Court.

### D.    Factual Background Related to Adversary Action

#### i.    *Credit Agreement and Debt Issuance*

As of the Petition Date, the TCEH Debtors had approximately $25.6 billion in principal amount of first lien debt (the "First Lien Debt") including:

(i) Approximately $22.6 billion of term loan and revolving loan debt (the "First Lien Bank Debt") under a credit agreement dates as of October 10, 2007 (as amended in 2009, 2011 and 2012, the "Credit Agreement") among various

---

[15] *Delaware Trust Co.*, 534 B.R. at 515-17 (citations and footnotes omitted).

parties, including Wilmington Trust, N.A., as successor administrative agent ("Administrative Agent") and successor collateral agent ("Collateral Agent");

(ii) Approximately $1.75 billion of 11.50% senior secured notes (the "First Lien Notes" held by "First Lien Noteholders") issued under an indenture dated as a of April 19, 2011 (as amended, the "First Lien Notes Indenture"), for which plaintiff Delaware Trust serves as indenture trustee; and

(iii) Approximately $1.23 billion of debt outstanding under certain first lien interest rate swap agreements and secured hedge and power sales agreements (the "First Lien Swap and Hedges" held by "First Lien Swap and Hedge Holders").

The First Lien Bank Debt, the First Lien Notes, and the First Lien Swaps and Hedges (collectively, the "First Lien Claims" and the holders of First Lien Claims, the "First Lien Creditors") were secured by liens on collateral granted pursuant to (i) the Security Agreement, dates as of October 10, 2007, as amended and restated as of August 7, 2009 (the "Security Agreement"), among TCEH, certain subsidiaries of TCEH, and Citibank, N.A., as initial collateral agent and (ii) the Pledge Agreement, dates as of October 10, 2007, as amended and restates as of August 7, 2009 (the "Pledge Agreement"), among EFCH, TCEH, and Citibank, N.A., as initial collateral agent. The collateral securing all of the First Lien Claims includes substantially all of the assets of TCEH Debtors (the "Collateral") and proceeds of any Collateral.[16]

---

[16] *See* Security Agreement, § 2; Murtagh Dec., Exh. O (Pledge Agreement § 2 (hereinafter, the "Pledge Agreement")).

### ii.    The Intercreditor Agreement

The relationship among the First Lien Creditors with respect to their shared collateral is governed by the Collateral Agent and Intercreditor Agreement which was executed in 2007 (as amended in 2009, the "Intercreditor Agreement," and collectively with the Security Agreement and the Pledge Agreement, the mortgages, and the Second Lien Intercreditor Agreement (as defined herein), the "Security Documents") and is governed by New York law.[17]

Section 2.1 of the Intercreditor Agreement provides that the scope and rank of the property rights that each First Lien Creditor maintains in the First Lien Collateral proceeds is *pari passu* as among the First Lien Creditors, "except as otherwise provided in Section 4.1."[18]

---

[17]  Intercreditor Agreement, § 9.6(a).

[18]  *Id.* at § 2.1.  Section 2.1 states in full:

> Pari Passu.  As among the [First Lien Creditors], all [First Property] Liens on the [First Priority] Collateral shall rank *pari passu*, no [First Lien Creditor] shall be entitled to any preferences or priority over any other [First Lien Creditor] with respect to the [First Lien] Collateral (except otherwise provided in Section 4.1) and the [First Lien Creditors] shall share in the [First Lien] Collateral and all Proceeds thereof in accordance with the terms of this Agreement.

Intercreditor Agreement, § 2.1.  "Proceeds" is defined

> as such term defined in Article 9 of the UCC and, in any event, shall include with respect to any Grantor, any consideration received from the sale, exchange, license, lease or other disposition of any asset or property that constitutes Collateral, any value received as a consequence of the possession of any Collateral and any payment received from any insurer or other Person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature of any asset or property that constitutes Collateral, and shall include (a) all cash and negotiable instruments received by or held on behalf of the Collateral Agent, (b) any claim of any Grantor against any third party for [claims dealing with Licenses, Trademarks, and Copyright] . . . and (c) any and

Section 4.1 of the Intercreditor Agreement sets out the waterfall for the disposition of collateral or proceeds of collateral received in connection with the sale or other disposition of, or collection on, such collateral or proceeds upon exercise of remedies under the Security Documents by the Collateral Agent to and among the First Lien Creditors (the "Waterfall").   Specifically, Section 4.1 provides:

> <u>Application of Proceeds</u>. Regardless of any Insolvency or Liquidation Proceeding which has been commenced by or against the Borrower or any other Loan Party, Collateral or any proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies under the Security Documents by the Collateral Agent shall be applied in the following order . . . :
>
> With respect to all Collateral other than Deposit L/C Collateral:
>
> [F]irst, on a pro rata basis, to the payment of all amounts due to the Collateral Agent, any Agent, and the Issuing Lenders . . . under any of the Financing Documents;
>
> [S]econd, on a pro rata basis to any Secured Party which has advanced or paid any fees to any Agent or Issuing Lender which has not been previously reimbursed;
>
> [T]hird, on a pro rata basis, to the payment of, without duplication, (a) all principal and other amounts *then due and payable* in respect of the Secured Obligations (including Cash Collateralization of all outstanding Revolving Letters of Credit) and (b) the payment of Permitted Secured Hedge Amounts *then due and payable* to any Secured Commodity Hedge Counterparty under any Secured Commodity Hedge and Power Sales Agreement; and

---

all other amounts from time to time paid or payable under or in connection with any of the Collateral.

Security Agreement, § 1 (d) "<u>Proceeds</u>."

> [L]ast, the balance, if any, after all of the Secured Obligations
> have been indefeasibly paid in full in cash, to the Loan Parties
> or as otherwise required by applicable law.[19]

Section 4.2 of the Intercreditor Agreement places certain limitations on cash

payments from Collateral proceeds post-default and provides:

> After (a) the commencement of any Insolvency or Liquidation
> proceeding in respect to any Loan Party . . . no payment of
> cash (or the equivalent of cash) shall be made from the
> proceeds of Collateral by any Loan Party to the Collateral
> Agent for the benefit of any Secured Party, except as provided
> for in Section 4.1.

The definition of "Secured Obligations" includes:

> [C]ollectively, (a) all advances to, and debts, liabilities,
> obligations, covenants and duties of, any [Obligor] arising
> under any Loan Document or otherwise with respect to an
> Loan, Posting, Advance or Letter of Creditor or under any
> Secured Cash Management Agreement, Secured Commodity
> Hedge and Power Sales Agreement or Secured Hedging
> Agreement . . . whether direct or indirect (including those
> acquired by assumption), absolute or contingent, due or to
> become due, now existing or hereafter arising and including
> interest and fees that accrue after the commencement by or
> against any [Obligor] of any proceeding under any
> bankruptcy or insolvency law naming such [Obligor] as the
> debtor in such proceeding, regardless of whether such
> interest and fees are allowed claims in such proceeding.
> Without limiting the generality of the foregoing, the Secured
> Obligations of the [Obligors] under the Loan Documents
> include (a) the obligation (including guarantee obligations) to
> pay principal, interest, charges, expenses, fees, attorney costs,
> indemnities and other amounts payable by any [Obligor]
> under any Loan Document and (b) all obligations of every
> nature outstanding under any Additional Obligations,
> whether fixed or contingent, matured or unmatured, **in each**

---

[19] Intercreditor Agreement, § 4.1 (emphasis added) (hereinafter, "Section 4.1").

> **case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding. "Secured Obligations" shall include, without limitation, interest accruing at the then applicable rate provided in the applicable Financing Document after the maturity date of the relevant Secured Obligations and any Post-Petition Interest.**[20]

Furthermore, the Intercreditor Agreement specifies that any payments of cash or its equivalents made after the commencement of a bankruptcy case with respect to any Obligor must be made in accordance with Section 4.1. Specifically, Section 4.2 provides, in relevant part:

> <u>Limitations on Payment Post Default</u>. After (a) the commencement of any Insolvency or Liquidation Proceeding in respect of any [Obligor] . . ., no payment of cash (or the equivalent of cash) shall be made from the proceeds of [First Lien] Collateral by any [Obligor] to the [First Lien] Collateral Agent for the benefit of any Secured Party, except as provided for in Section 4.1.[21]

The term Secured Obligations does not appear in Section 4.1 of the Intercreditor Agreement. The Intercreditor Agreement also confirms the rights of the First Lien Creditors relative to one another continue regardless of a bankruptcy proceeding.[22]

---

[20] Intercreditor Agreement, §1.1, definition of "Secured Obligations" (emphasis added). The term "Post-Petition Interest" is defined to mean "any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency or Liquidation Proceedings, whether or not allowed or allowable in any such Insolvency or Liquidation Proceeding." *Id.* at §1.1, definition of "Post-Petition Interest."

[21] Intercreditor Agreement § 4.2.

[22] Section 8.3 provides that "[a]ll rights, interests, agreements and obligation of each of the Collateral Agent, the Administrative Agent and the Secured Parties, respectively, hereunder shall remain in full force and effect irrespective of . . . (d) the commencement of any Insolvency or Liquidation proceeding in respect of [an Obligor]." Intercreditor Agreement, § 8.3. Section 9.2 provides that "[t]he terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding." Intercreditor Agreement, § 9.2(a).

Certain rights under the Intercreditor Agreement, such as the right to direct the Collateral Agent to exercise remedies and the right to consent to amendments, are restricted to Required Secured Parties.[23]  Required Secured Parties is defined as the secured parties holding more than 50% of the sum of the outstanding amount under the First Lien Bank Debt and the Eligible Hedge Voting Amount under the Secured Commodity Hedge and Power Sales Agreement (as such terms are defined in the Intercreditor Agreement).[24]  It does not include the First Lien Noteholders.

TCEH also issued certain second lien notes.  The relationship between the First Lien Creditors and the holders of the second lien notes is governed by a second lien intercreditor agreement dates as of October 6, 2010 (the "Second Lien Intercreditor Agreement"), among the TCEH Debtors, the Collateral Agent, the Bank of New York Mellon Trust Company, N.A. as initial second priority representative.

### iii.    Cash Collateral Order

On or around the Petition Date, the TCEH Debtors sought authorization to use cash collateral and approval of an adequate protection package (the "Cash Collateral Motion).[25]  The Court entered an interim cash collateral order, which provided that the First Lien Creditors were entitled to adequate protection to the extent of any diminution in value of their interests in Collateral in the form of, among other things, the Adequate

---

[23] Intercreditor Agreement §§ 9.3 and 9.4.

[24] Intercreditor Agreement § 1.

[25] D.I. 71.

14

Protection Payment calculated by apply a per annum rate equal to the LIBOR Rate + 450 basis points to the "aggregate outstanding amount of Prepetition First Lien Obligations as of the Petition Date."[26]

Aurelius Capital Management ("Aurelius") filed an objection to the proposed final cash collateral order.[27] The Aurelius objection concerned the allocation of Adequate Protection Payments among the First Lien Creditors. Specifically, Aurelius argued that the Adequate Protection Payment should be allocated among the First Lien Creditors in a manner that takes into account the hypothetical accrual of postpetition interest under the various tranches of First Lien Debt, with a recalculation each month to reflect each tranche's variation in claim size (the "Postpetition Interest Allocation Method"). Several First Lien Bank Debt Holders opposed Aurelius's allocation bid. This Court received briefs and heard argument on the allocation dispute. As it happened, this Court informed the parties that it was not prepared, at that point, to resolve the monthly payments allocation issue. As a result, this Court ordered that the difference between the Post-Petition Interest Allocation Method and the Petition Date Allocation Method be placed in escrow pending further order of this Court or another court of competent jurisdiction (which led to the First Lien Noteholder Action in the SDNY discussed *supra*).

Thereafter, in response to this Court's ruling, the Debtors and the Ad Hoc Committee of TCEH First Lien Creditors (the "Ad Hoc Committee") agreed to language

---

[26] D.I. 324 (the "Interim Cash Collateral Order") at ¶ 5.

[27] D.I. 632.

in the Final Cash Collateral order (i) fully reserving all First Lien Creditors' rights to dispute the Petition Date Allocation Method or the Postpetition Interest Allocation Method should be applied to the allocation of Adequate Protection Payments and (ii) establishing an escrow account funded by the TCEH Debtors from ratable deductions of the Adequate Protection Payments each month with an amount equal to the difference between the Petition Date Allocation Method and the Postpetition Interest Allocation Method (such difference, the "Holdback Amount").  The Court approved the final cash collateral order (the "Final Cash Collateral Order").[28]  The Final Cash Collateral Order requires that the Adequate Protection Payments be made to the Administrative Agent on behalf of the holders of First Lien Bank Debt, to the First Lien Notes Trustee on behalf of the holders of the First Lien Notes, and directly to the holders of First Lien Swaps and Hedges.

### iv.    Proofs of Claims

On or about October 15, 2014, Morgan Stanley filed a Proof of Claim in these bankruptcy proceedings[29] (the "Morgan Stanley Claim").  In the Morgan Stanley Claim, Morgan Stanley asserts that, pursuant to the ISDA Master Agreement, "the amount payable by TCEH to [Morgan Stanley]" is $226,465,000, which "continues to accrue interest at the Applicable Rate (as defined in the Master Agreement.)."  Morgan Stanley also states that the claim includes "interest from the Early Termination Date through the

---

[28]  D.I. 855 at ¶¶ 5 and 6.

[29]  Claim Nos. 5304-5343. *See also* DTC Answering Brief, Adv. D.I. 68, App. A.

[post-petition] claims bar date of October 27, 2014, as well as amounts due for interest that continues to accrue thereafter. . . . "

On or about October 24, 2014, the First Lien Administrative Agent (Wilmington Trust) filed a Proof of Claim on behalf of the holders of the First Lien Bank Debt, including Titan.[30]  Wilmington Trust asserts that "Obligations" under the Credit Agreement and any other Transaction Documents – including "interest and fees that accrue in a bankruptcy case of a Debtor, regardless of whether such interest and fees are allowed claims in the bankruptcy case" – became "due and payable immediately" upon default.[31] The First Lien Collateral Agent also filed a proof of claim with similar assertions.[32]

On or about October 27, 2014, J. Aron filed a proof of claim.[33]  J. Aron's proof of claim includes "interest at the Default Rate."[34]

> v.    *The PSA and the Plan of Reorganization*

On August 10, 2015, the Debtors filed a motion seeking approval of a plan support agreement that was negotiated with the support of the majority of the TCEH Debtors' secured and unsecured creditors.[35]   The Bankruptcy Court approved the TCEH Debtors'

---

[30] Claim No. 7489.  *See also* DTC Answering Brief, Adv. D.I. 68, App. B.

[31] *Id.* at ¶¶ 7.

[32] Claim No. 7488.  *See also* DTC Answering Brief, Adv. D.I. 68, App. C.

[33] Claim No. 9555. *See also* DTC Answering Brief, Adv. D.I. 68, App. D.

[34] *Id.* at 3.

[35] D.I. 5248.

entry into the plan support agreement on September 18, 2015 (the "PSA").[36]  Shortly

thereafter, the Debtors filed the plan and related disclosure statement.[37]

Under the Plan, holders of First Lien Claims will receive (i) the common stock of

Reorganized TCEH ("Reorganized TCEH Common Stock"); (ii) 100% of the TCEH

Debtors' cash on-hand ("Cash On-Hand") and Reorganized TCEH's new debt or the cash

proceeds of such new debt (collectively, the "Reorganized TCEH Debt Funds"); (iii) the

rights to purchase $700 million of EFH common stock under a rights offering and the

EFH common stock purchased pursuant to the exercise of those rights (the "Rights");

(iv) certain stock in TCEH's ultimate parent (the "Assigned C5 Rights") and any excess

cash that remains after distributions are made to the holders of general unsecured claims

against certain of the TCEH Debtors (the "Cash-Out Election Pool Excess Cash"); and

(v) the rights to receive payments pursuant to a tax receivable agreement entered into by

Reorganized TCEH if any (the "TRA Rights") (collectively, the "Plan Distributions").[38]

The Plan provides that all Plan Distributions will be distributed in accordance with

the Petition Date Allocation Method, except that the Plan Distributions in (numbering

consistent   with   numbering   above)   (i)   Reorganized   TCEH   Common   Stock,

---

[36] D.I. 6097.  The PSA prohibited the Collateral Agent form supporting any alternative restructuring plan that lacks specified terms.  PSA § 6.1.  Further, the Collateral Agent is effectively barred from taking any action inconsistent with the PSA and the Plan because the parties to the PSA are obligated to "promptly direct" the Collateral Agent to cease and refrain from taking any such action in the event it were to attempt to do so.  PSA §§4.10(f), 5.4(f).

[37] D.I. 6123 (as later amended, the "Plan") and 6124 (the "Disclosure Statement").

[38] *See* Plan Art. III.B.28(c)(i-v).

(ii) Reorganized TCEH Debt Funds, and (v) TRA Rights above will be distributed in accordance with a final order in this action that shall determine the appropriate allocation methodology.

## STANDARD OF REVIEW

### A.    Motion for Judgment on the Pleadings

The standard for a Rule 12(c) motion is the same as the standard for a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.[39]  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'"[40]  At this stage in the proceeding, it is not the question of "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[41]  Since the *Twombly* and *Iqbal* decisions, "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading."[42]  This new standard requires "a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[43] It is insufficient to provide "threadbare recitals of the elements of a cause of action,

---

[39] *In re Fedders North America, Inc.*, 422 B.R. 5 (Bankr. D. Del. 2010) (*citing In re G–I Holdings, Inc.*, 328 B.R. 691, 693–94 (D. N.J. 2005); *Children's Seashore House v. Waldman*, 197 F.3d 654, 657 n. 1 (3d Cir. 1999)).

[40] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).

[41] *Scheuer v. Rhodes*, 416 U.S. 232, 236, abrogated on other grounds by, *Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *see also Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 134 (Bankr. D. Del. 2005).

[42] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[43] *Id.*

supported by mere conclusory statements . . . ."[44]   Under the heightened standard, a complaint "must contain either direct or indirect allegations respecting all the material elements necessary to sustain recovery under some *viable* legal theory."[45]   The Court, in order to determine whether a claim meets this requirement, must "draw on its judicial experience and common sense."[46]   In *Fowler*, the Third Circuit articulated a two-part analysis to be applied in evaluating a complaint.[47]   First, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[48]   Second, the court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"[49]

## B.   Motion for Summary Judgment

In the alternative, DTC seeks partial summary judgment on these issues.  Federal Rule of Civil Procedure 56 is made applicable to these adversary proceedings by Federal Rule of Bankruptcy Procedure 7056 and directs that summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and the movant is

---

[44] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).

[45] *Twombly*, 550 U.S. at 562.

[46] *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 34 (Bankr. D. Del. 2011).

[47] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

[48] *Id*.

[49] *Id*. at 211.

entitled to judgment as a matter of law."[50]  Summary judgment is designed "to avoid trial

or extensive discovery if facts are settled and the dispute turns on an issue of law."[51]

## C.  Summary

Neither party before the Court has raised a genuine dispute of a material fact or

expressed a need for more discovery.  The questions before the Court are purely legal in

nature.  Thus, it is appropriate for the Court to consider the legal arguments at this time.[52]

### ANALYSIS

## A.  Contract Interpretation

Under New York law, which governs the Intercreditor Agreement,[53] the Court

need not look "outside the four corners" of a complete document to determine what the

parties intended.[54]  Here, neither party has alleged that the Intercreditor Agreement is an

incomplete document, so it is not necessary to resort to extrinsic evidence to interpret it.

Moreover, neither party contends that any term in the Intercreditor Agreement is

ambiguous—instead, each party relies on its own "plain reading" in reaching competing

results.  A contract is not ambiguous merely because the parties offer different

---

[50] Fed. R. Civ. P. 56(a); *see also In re Delta Mills, Inc.*, 404 B.R. 95, 103 (Bankr. D. Del. 2009).

[51] *Delta Mills*, 404 B.R. at 104.

[52]  *Niagara Frontier Transit Metro Sys., Inc. v. Cnty. of Erie*, 212 A.D.2d 1027 (1995) ("Where the contract is unambiguous on its face, it should be construed as a matter of law and summary judgment is appropriate.")); *Green Mach. Corp. v. Zurich Am. Ins. Grp.*, No. CIV. A. 99-3048, 2001 WL 1003217, at *6 (E.D. Pa. Aug. 24, 2001) ("Whether a contract provision is ambiguous is a question of law for the court."), *aff'd sub nom. Green Mach. Corp. v. Zurich-Am. Ins. Grp.*, 313 F.3d 837 (3d Cir. 2002).

[53]  Intercreditor Agreement, § 9.10.

[54]  *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990).

constructions of the same term.[55]  The Court finds that the Intercreditor Agreement is not ambiguous.

As the Court reaches the conclusion that the Intercreditor Agreement is unambiguous, the Court then relies on long-recognized canons of interpretation to determine its meaning.  First, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing."[56]  Second, should there be an inconsistency between a specific and general provision of a contract, the specific controls.[57]  Third, "[a] reading of the contract should not render any portion meaningless."[58]

The parties discuss extrinsic evidence in depth in their briefs, such as the Notes Offering Memorandum, Model First Lien/Second Lien Intercreditor Agreements, the Second Lien Intercreditor Agreement, and speculation regarding commercial context.  As the Court finds that the Intercreditor Agreement is not ambiguous, these documents will not be discussed by the Court and are irrelevant to the ruling on the Motions.

---

[55] *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

[56] *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) (internal quotation marks and citation omitted).

[57] *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *Waldman v. New Phone Dimensions, Inc.*, 487 N.Y.S.2d 29, 31 (N.Y. App. Div. 1985).

[58] *See Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213 (N.Y. 2007) (quotation marks and citations omitted); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms.").

**B. Section 4.1's Application of Proceeds**

In order to prevail, DTC must show that each element of Section 4.1 is met. The elements are:

> (i) Collateral or any proceeds of Collateral are to be distributed to the First Lien Creditors;
>
> (ii) the Collateral must be "received" by the Collateral Agent;
>
> (iii) the Collateral or the proceeds of Collateral must have resulted from a sale or other disposition of, or collection on, such Collateral; and
>
> (iv) the sale, disposition, or collection must have resulted from the exercise of remedies under the Security Documents.

As Section 4.1 is the only section in the Intercreditor Agreement regarding application and distribution of proceeds, if *any* of these initial requirements are not met, then the Adequate Protection Payments and the Plan Distributions would be distributed outside of the Intercreditor Agreement (i.e. pursuant to the terms of the Bankruptcy Code, orders of this Court, and the Plan).

> **i.    *Collateral or any proceeds of Collateral are to be distributed to the First Lien Creditors.***

> **a.  Plan Distributions**

As stated above, under the Plan, the First Lien Creditors are receiving: (i) Reorganized TCEH Common Stock, (ii) Cash On-Hand and Reorganized TCEH Debt Funds, (iii) Rights, (iv) the Assigned C5 Rights and any Cash-Out Election Pool Excess

Cash, and (v) the TRA Rights.[59]  The Plan also automatically extinguishes the First Lien

Creditors' liens.  The Plan further creates a Reorganized TCEH, the successor to TCEH.

DTC asserts that Plan Distributions, as a whole, constitute Collateral because they

are (i) "consideration received from the sale, exchange, license, lease or other disposition

of any asset or property that constitutes Collateral;" and (ii) amounts "receivable or

received when Collateral or proceeds are sold, exchanged, collected or otherwise

disposed of."[60]  DTC asserts that as part of the spin-off transaction in the Plan,

substantially all of the First Lien Collateral will be **sold** by TCEH to Reorganized TCEH

in exchange for 100% of Reorganized TCEH's stock and the proceeds from the Debt

Offering and the Preferred Stock Sale.[61]  In turn, these amounts will be distributed to the

First Lien Creditors as part of the Plan Distributions.  DTC argues that the Stock

Distributions in particular constitute Collateral because substantially all of the TCEH's

subsidiaries constitute First Lien Collateral under the Pledge Agreement.  Under the Plan,

these subsidiaries' assets will be "sold" to Reorganized TCEH, which, in turn, according

to DTC, will be distributed as stock in Reorganized TCEH to the First Lien Creditors.

DTC asserts that this is a direct transfer of First Lien Collateral to the First Lien Creditors;

effectively no different than if the First Lien Creditors had foreclosed or otherwise

collected on the subsidiaries themselves.

---

[59]  *See* Plan Art. III.B.28(c)(i-v).

[60]  Security Agreement, §§ 2(a)(xv) and 1.1; Pledge Agreement § 2(a) and (c).

[61]  Plan Art. IV § B.2.

DTC continues that the Cash Distribution is Collateral.  DTC asserts that in the Cash Collateral Order the TCEH Debtors stipulated that their "Cash on Hand" constituted First Lien Collateral.  DTC argues that to the extent the Cash Distribution includes debt itself from the Debt Offering, it would still be Collateral.  DTC asserts that the "Cash Proceeds" from the Preferred Stock Sale also constitute Collateral under the Pledge Agreement.  Lastly, DTC asserts that the TRA Distribution also should be considered Collateral because it constitutes "value received as a consequence of the possession of any Collateral."

In *Momentive*,[62] there was a debt-for-equity swap in the plan, where the common stock of the newly reorganized debtors was being distributed to lien holders.  Judge Drain held that the lien holders did not have a lien on the newly issued stock and the newly issued stock was not part of the lien holders' collateral.[63]  Judge Drain continued that the collateral did not change in any way as a result of the issuance and distribution of the new stock – therefore, to argue that the new stock received constituted proceeds of collateral would unfairly add to such collateral.[64]  Judge Drain held that to hold that newly issued stock to be proceeds of collateral

> also would contradict the case law addressing whether a secured creditor receives the "indubitable equivalent" of its secured claim under section 1129(b)(2)(A)(iii) of the

---

[62] *BOKF, N.A. v. JP Morgan Chase Bank, N.A. (In re MPM Silicones, LLC)*, 518 B.R. 740 (Bankr. S.D.N.Y. 2014) (hereinafter, "*Momentive*").

[63] *Momentive*, 518 B.R. at 754.

[64] *Id.* at 755-56.

> Bankruptcy Code if it receives stock in the reorganized enterprise as part of cramdown treatment under a chapter 11 plan.  Obviously, if the stock were collateral proceeds to which the creditor's lien would attach, it would not be substitute collateral appropriate for analysis under the "indubitable equivalent" cramdown alternative in section 1129(b)(2)(2)(A)(iii).[65]

In its argument, DTC attempts to distinguish the *Momentive* decision arguing that this case is different because rather than issuing stock in TCEH to the First Lien Creditors under the Plan as part of a standard debt-for-equity swap as was done in *Momentive*, TCEH is instead creating a new entity – Reorganized TCEH – transferring its interest in its subsidiaries to that entity, and issuing the stock in Reorganized TCEH to the First Lien Creditors under the Plan (the "Internal Spin-Off Transaction").  The Court is not persuaded by this distinction.  Reorganized TCEH's shares are akin to the shares distributed in *Momentive*.  This Court adopts Judge Drain's holding as set forth above.

Furthermore, the transaction in the Plan is not akin to a foreclosure.  There was no motion for relief from the stay or taking over of assets by the First Lien Creditors.  There is no disposal of assets.  The First Lien Creditors did not take any action in this Court to take control of the assets as would happen in a foreclosure action.  Furthermore, in a foreclosure action, the First Lien Creditors would have a deficiency claim against the Debtors, this is not the case either.[66]

---

[65] *Id.* at 756 (citations omitted).

[66] *In re Watson*, 384 B.R. 697, 704 (Bankr. D. Del. 2008) ("The rights of a mortgage lender generally include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon

DTC also asserts that the debt from the Reorganized TCEH Debt Funds in an "Instrument" or "Investment Property" and, thus, proceeds from the Reorganized TCEH Debt Funds and Preferred Stock Sale are Instruments or Investment Property under the Security Agreement.[67]   However, the Debt Funds are *debt* and **not** *assets* of Reorganized TCEH.   These Debt Funds will be an *obligation* of Reorganized TCEH, not an *asset* of Reorganized TCEH into which collateral was converted.

DTC asserts that cash proceeds from the Preferred Stock Sale are collateral because collateral includes "Stock" in subsidiaries.  However, stock in a newly created subsidiary of a reorganized debtor is, similar to stock in the reorganized debtor itself, not proceeds.[68]

Regarding the TRA Rights, the TRA Rights do not derive from the TCEH Debtors' assets that constitute Collateral; rather, the right derive from the Tax Receivable Agreement which belongs to Reorganized TCEH.  It does not appear to be Proceeds of the First Lien Lender's Collateral.

Lastly, DTC asserts that even if the Plan Distributions are not Collateral, then the Plan Distributions are "proceeds of Collateral."   However, Security Agreement's definition of "Proceeds" limits the definition as follows:

> term defined in Article 9 of the UCC and, **in any event, shall include** with respect to any Grantor, any consideration received from the sale, exchange, license, lease or other

---

default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure." (citation omitted)).

[67]  DTC Motion at pp. 27-28.

[68]  *Momentive* at 754.

disposition of any asset or property that constitutes Collateral, any value received as a consequence of the possession of any Collateral and any payment received from any insurer or other Person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature of any asset or property that constitutes Collateral, and shall include (a) all cash and negotiable instruments received by or held on behalf of the Collateral Agent, (b) any claim of any Grantor against any third party for [claims dealing with Licenses, Trademarks, and Copyright] . . . and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.[69]

To argue that any of the Plan Distributions, including any Cash Distribution, are included in the definition of "Proceeds" ignores the beginning part of the paragraph that limits "Proceeds" to (i) any consideration received from the sale/disposition of assets, (ii) value received as a consequence of possessing the Collateral, or (iii) insurance proceeds.

### b. Adequate Protection Payments

DTC asserts that the Adequate Protection Payments are also Collateral because they constitute "amounts from time to time paid or payable under or in connection with any of the Collateral;" the Adequate Protection Payments are being made "in connection with" and as an express condition of TCEH's continued use of the First Lien Collateral; the Adequate Protection Payments constitute payments received "as a result of the [ . . .] loss [. . .] of whatever nature of any asset or property that constitutes Collateral" within the meaning of the Security Agreement; the Adequate Protection Payments are or should be deemed cash "received by or held on behalf of" the Collateral Agent within the

---

[69] Security Agreement, § 1(d) (emphasis added).

meaning of the Security Agreement; and the Collateral Agent holds the First Priority Liens, and the powers, rights, and remedies under the Intercreditor Agreement and the Security Documents (including the right to seek Adequate Protection Payments).[70]

Adequate Protection Payments are not a payment of collateral – rather, adequate protection is designed to protect secured creditors against diminution in value of their collateral. The purpose of adequate protection "is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor."[71]

> Although the question was once in substantial doubt, it is now established that "adequate protection" is meant only to assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property, rather than to compensate the creditor for the bankruptcy-imposed delay in enforcing its rights in that property. Where a creditor is threatened with a decline in the value of its collateral, the Bankruptcy Code provides that the estate must protect the creditor's interest, either by periodic payments or substitute liens covering the decline, or by some other means that provides the "indubitable equivalent" of the creditor's interest in the estate's property. In the absence of such "adequate protection," a creditor threatened with a decline in the value of its interest in the estate's property is entitled to

---

[70] In the Cash Collateral Order, the Court authorized TCEH to make the Adequate Protection Payments directly to the respective representatives of the First Lien Creditors, rather than to the Collateral Agent in the first instances. *See* Cash Collateral Order at ¶ 6(a). *But see Omnibus Response of Wilmington Trust, N.A., in Its Capacity As Successor First Lien Collateral Agent, to Objections to the Motion Of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry Of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* ¶ 9 (D.I. 731) (The "payment of the [Adequate Protection] Payment directly to the agents, rather than to the First Lien Collateral Agent, was not intended to, nor has the effect of, altering the manner in which [Adequate Protection] Payments may be allocated under the Intercreditor Agreement.").

[71] *In re Satcon Tech. Corp.*, No. 12-12869 KG, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (citation omitted).

> relief from the automatic stay to pursue its remedies against
> the property in which it has an interest.[72]

As such, adequate protection against diminution in the value of collateral does not constitute payment of collateral.

### ii. The Collateral must be "received" by the Collateral Agent.

Per the Cash Collateral Order, the Adequate Protection Payments are not being made to the Collateral Agent; nonetheless DTC argues that these payments "are or should be deemed cash 'received by or held on behalf of' the Collateral Agent within the meaning of the Security Agreement."[73]  The Intervenors argue that "should have been received" or "deemed to be received" by the Collateral Agent is an unnecessary expansion of the definition of "Proceeds."  Here, the definition of Proceeds in the Security Agreement says "received by or held on behalf of the Collateral Agent."[74]  DTC has not "received" any of the Adequate Protection Payments; furthermore, if the Court finds that the Petition Date Allocation Method is appropriate (which it does), then DTC will not be receiving the Plan Distributions; therefore, DTC cannot meet this prong of Section 4.1.

### iii. The Collateral or the proceeds of Collateral must have resulted from a sale or other disposition of, or collection on, such Collateral.

DTC asserts that the Internal Spin-Off Transaction is a "sale."  In its argument, DTC attempts to distinguish *Momentive* from the case *sub judice*.  However, such distinction fails.  DTC is elevating form over substantive in attempting to distinguish the

---

[72] *In re Addison Properties Ltd. P'ship*, 185 B.R. 766, 769-70 (Bankr. N.D. Ill. 1995) (citations omitted).

[73] DTC Motion at 30.

[74] Security Agreement, § 1(d).

debt-for-equity swap.  Nothing in the Plan states that Reorganized TCEH is "purchasing" the Collateral, Reorganized TCEH is not a third-party purchaser, and there is not an "economic event" that would create that sort of relationship.  Currently, TCEH is owner of the subsidiaries that will become part of Reorganized TCEH – so the "collateral" is moving from shares to assets, which is an irrelevant distinction for the purposes of evaluating the shift in Collateral.

In *Momentive*, Judge Drain held:

> Very clearly, however, a secured creditor is not getting the proceeds of its collateral when it gets stock in the reorganized entity, unless, of course, that stock was paid by a third-party buyer in return for the debtor's assets comprising the collateral. [75]

The creation of Reorganized TCEH through the Plan, under these circumstances, does not elevate the Internal Spin-Off Transaction to a "sale."

> iv.   ***The sale, disposition, or collection must have resulted from the exercise of remedies under the Security Documents.***

DTC asserts that the Plan Distributions and Adequate Protection Payments are being made "upon the exercise of remedies under the Security Documents by the Collateral Agent."  DTC sets forth the following reasons for its belief that it is "exercising remedies:" (i) the Collateral Agent necessarily exercises remedies under the Security Documents in protecting and enforcing the First Lien Creditors' rights in these cases, including with respect to the Cash Collateral Order, the PSA, the Adequate Protection

---

[75] *Id.* at 756 (citations omitted; emphasis added).

Payments, and the Plan Distributions; (ii) the Collateral Agent will be exercising a remedy under the Security Documents when it accepts the Plan Distributions on behalf of the First Lien Creditors (section 3.1(c)(iv) of the Intercreditor Agreement states that "acceptance of the Collateral in full or partial satisfaction of the Secured Obligation" constitutes the exercise of a remedy by the Collateral Agent); (iii) the Collateral Agent has exercised and continues to exercise remedies with respect to the Adequate Protection Payments because the Collateral Agent is the only party authorized to seek and to receive Adequate Protection Payments under the Intercreditor Agreement; (iv) the Collateral Agent's forbearance of rights is sufficient to constitute the exercise of remedies under the Intercreditor Agreement.

Section 3.1 of the Intercreditor Agreement states:

> The Required Secured Parties will have, subject to the terms of this Agreement, the right to authorize and direct the Collateral Agent with respect to the Security Documents and the Collateral, including, without limitation, the exclusive right to authorize or direct the Collateral Agent to enforce, collect or realize on any Collateral or exercise any other right or remedy with respect to the Collateral. Such exercise and enforcement shall include the rights of the Collateral Agent to sell or otherwise dispose of Collateral upon foreclosure, to incur reasonable expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and the Security Documents and of a secured creditor under the Bankruptcy Code and other applicable law; _provided_ that unless and until the Collateral Agent shall have received such direction, the Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, in order to preserve

> or protect its Liens on and the value of the Collateral as it shall deem advisable in the best interest of the Secured Parties.
>
> . . .
>
> In exercising rights and remedies with respect to the Collateral after the occurrence and during the continuance of any Event of Default, the applicable Secured Debt Representative may, **at the direction of the Required Secured Parties**, instruct the Collateral Agent to enforce (or to refrain from enforcing) the provisions of the Security Documents in respect of the Secured Obligations and exercise (or refrain from exercising) remedies thereunder or any such rights and remedies, all in such order and in such manner as the Collateral Agent may determine unless otherwise directed by the Required Secured Parties . . . .[76]

Section 3.1 continues to list things the Collateral Agent may do "at the direction of the Required Secured Parties," unless otherwise instructed, including, but not limited to, "the acceptance of the Collateral in full or parties satisfaction of the Secured Obligation . . . ."[77]

The Intervenors respond that "holding the liens" is not an "exercise of remedies." And, if it was, then this section would be superfluous because simply holding the liens would always constitute an "exercise of remedies."  The Intervenors continue that the fact that the Collateral Agent actively participated in the negotiations involving the Cash Collateral Order and the Plan Support Agreement ("PSA") and has consented (either affirmatively or through lack of objection) to the provisions therein does not constitute an "exercise of remedies" – because nothing requires the Collateral Agent to take action with respect to the Collateral or to collect on any of the Collateral or other assets of the

---

[76] Intercreditor Agreement, § 3.1.

[77] Intercreditor Agreement, § 3.1(c)(iv) (emphasis added).

TCEH Debtors.  The Intervenors argue that because there was an Event of Default, the Collateral Agent *could only* have acted (or refrained from acting) at the direction of the Required Secured Parties, which did not occur.  The Invervenors argue that, after an Event of Default, the acceptance of Collateral in full or partial satisfaction of the Secured Obligations must be at the direction of the Required Secured Parties based on the language of the Intercreditor Agreement.

The Waterfall in Section 4.1 *only* applies if there was an "exercise of remedies." The Court agrees that "simply" holding liens is not an exercise of remedies.  Furthermore, in an Event of Default,[78] the Collateral Agent would need to take direction Required Secured Parties in order to satisfy the Secured Obligations, which would be the case with Plan Distributions.  As such, all actions taken since the Petition Date (the filing of bankruptcy is an Event of Default) could only be upon the direction of the Required Secured Lenders.

DTC asserts that the filing of a proof of claim is an "exercise of remedies." However, DTC did not receive a direction to file a proof of claim from the Required Secured Parties.  Furthermore, *even if* filing of a claim does rise to the level of an exercise of remedies, which in this case the Court is not inclined to hold, as stated *supra*, DTC cannot meet any other of the requirements of Section 4.1.

---

[78] *See* Intercreditor Agreement, § 3.1(b)(1).

### C. Due and Payable

Even if DTC were able to meet the initial requirements of Section 4.1 of the Intercreditor Agreement, which it cannot do, it would also have to prevail on the meaning of "due and payable" in Section 4.1, which states:

> (a) With respect to all Collateral other than Deposit L/C Collateral
>
> <u>third</u>, on a <u>pro rata</u> basis . . . (a) all principal and other amounts **then due and payable** in respect of the Secured Obligation . . . [79]

DTC argues that, by its plain terms, the third paragraph of the Section 4.1 allocation Waterfall applies "regardless of any Insolvency or Liquidation Proceeding[.]" Thus, that the Debtors have filed for bankruptcy, or that post-petition interest might not be allowed to be collected from the Debtors in these Bankruptcy proceedings, has no bearing on the Waterfall in Section 4.1. DTC argues that when Collateral is applied to the First Lien Creditors on a *pro rata* basis pursuant to the third paragraph of the Waterfall, the Secured Obligations then due and payable must include unpaid Post-Petition Interest that has accrued regardless of whether such interest has been (or could be) allowed in a bankruptcy proceeding. DTC reasons that the term "then due and payable" allows the *pro rata* allocation calculations to account for and keep pace with changing circumstances. DTC continues that the term "then due and payable" requires the Collateral Agent to assess the Secured Obligations at the particular point in time Collateral is being allocated,

---

[79] Intercreditor Agreement, § 4.1(a) (bolded emphasis added).

not as it might have been allocated in the past or might potentially in the future.   In

essence, DTC is arguing that "due and payable" does not mean "allowed as against the

Debtors;" but means "due and payable in the Intercreditor Agreement."   DTC reads

Section 4.1 together with the definition of Secured Obligations in their interpretation.[80]

Because none of the initial requirements of section 4.1 are met, the Court need not rule on

whether all principal and other amounts are "due and payable in respect of the Secured

Obligations" and explicitly makes no ruling on the issue.[81]

## D.    Ability to Issue a Final Order

In its First Amended Complaint, DTC asserts that it "does not consent to the entry

of a final order or judgment by the bankruptcy court" and that "the bankruptcy judge

shall submit proposed findings of fact and conclusions of law to the district court, and

any final order or judgment shall be entered by the district judge after considering the

bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those

matters to which any party has timely and specifically objected."[82]   DTC further argues

that "[t]here has been no waiver of Delaware Trust's constitutional right to have this

---

[80]   "Secured Obligations" is defined in the Intercreditor Agreement and states in relevant part: "(b) all obligations of every nature outstanding under any Additional Obligations, whether fixed or contingent, matured or unmatured, in each case whether or not allowed or allowance in an Insolvency or Liquidation Proceeding.   "Secured Obligations" shall include, without limitation, interest accruing at the then application rate provided in the applicable Financing Documents after the maturity of the relevant Secured Obligations and any Post-Petition Interest."   Intercreditor Agreement, §1.1 "Secured Obligations."

[81]   In addition, Titan makes a number of arguments to the effect that DTC is improperly seeking to subordinate its claims.   As with the due and payable argument, the Court need not and does not address these issues.

[82]   First Amended Complaint at 6 n. 8 (*citing* 28 U.S.C. § 157(c)(1)).

dispute heard by an Article III court . . . ."[83]  While DTC may not have consented to this Court issuing a final order nor waived its Constitutional rights, the issue of whether this is a core proceeding has already been decided.  Judge Engelmayer held in his opinion transferring venue that this is a core proceeding.  That decision is law of the case.

Under the law of the case doctrine, when a court decides upon a rule of law that decision continues to govern the same issues in subsequent stages in the same case.  This rule of practice promotes the finality and efficiency of the judicial process by protecting against the continued litigation of settled issues.[84]

As Judge Carey held in *In re Winstar Communications, Inc.*:

> Federal courts routinely apply law of the case principles to transfer decisions of coordinate courts. The policies supporting the doctrine apply with even greater force to transfer decisions than to decisions of substantive law; transferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation.[85]

Thus, the decision of the previous court that this matter is a "core proceeding" is law of the case and this Court can and will issue a final order in this matter.

---

[83] DTC Motion at pp. 39-40.

[84] *Eastern Pilots Merger Comm. v. Continental Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 279 F.3d 226, 232-33 (3d Cir. 2002) (citations and internal quotation marks omitted).

[85] *Winstar Holdings, LLC v. The Backstone Group, LP (In re Winstar Commc'ns, Inc.)*, 435 B.R. 33, 39 (Bankr. D. Del. 2010) *aff'd*, No. AP 08-50296-KJC, 2013 WL 6053838 (D. Del. Nov. 15, 2013) *aff'd*, 591 F. App'x 58 (3d Cir. 2015) (citations, internal quote marks and modifications omitted).

## CONCLUSION

For the reasons set forth above, the Court will (i) grant the J. Aron/Morgan Stanley Motion; (ii) grant, in part, and deny, in part, Titan's Motion;[86] and (iii) deny DTC's Motion.   The Court finds that the Petition Date Allocation Method is the appropriate method for distributing the Plan Distributions and the Adequate Protection Payments between and among the First Lien Creditors.

An order will be issued.

---

[86] *See* fn. 81, *supra.*