# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS | ) | Case No. 14-10979 (CSS) |
| CORP., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| ———————————————— | ) | |
| DELAWARE TRUST COMPANY, as | ) | |
| TCEH First Lien Indenture Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No: 15-51239 (CSS) |
| | ) | |
| WILMINGTON TRUST, N.A., as First Lien | ) | |
| Collateral Agent and First Lien Administrative | ) | |
| Agent, et al., | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MORGAN STANLEY CAPITAL GROUP INC., | ) | |
| J. ARON & COMPANY, and TITAN | ) | |
| INVESTMENT HOLDINGS LP, | ) | |
| | ) | |
| Intervenors. | ) | |
| ———————————————— | ) | |

## OPINION[1]

Dated: April 27, 2017

Sontchi, J. _____

---

[1] The motion before the Court was brought under Fed. R. Civ. P. 60(b), made applicable by Fed. R. Bankr. P. 9024, and Fed. R. Bankr. P. 8008. However, the initial motion was brought under Fed. R. Bankr. P. 7012. "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

# INTRODUCTION[2]

There are 3 different types of TCEH First Lien Creditors in this adversary proceeding – each with a different interest rate.  The First Lien Noteholders have the highest interest as between and among the other TCEH First Lien Creditors.  Even though the First Lien Creditors, as a whole, are undersecured and not entitled to post-petition interest from TCEH, the First Lien Noteholders assert that post-petition interest should accrue on the respective pieces of First Lien Debt for purposes of allocating payments between and among the First Lien Holders (referred to herein as the "Post-Petition Interest Allocation Method").  The other two groups of First Lien Holders (referred to herein as the "Non-Noteholders" or the "Intervenors") do not agree and believe that the money should be allocated on a *pro rata* basis based on the amounts owed as of the Petition Date with no consideration of post-petition interest (referred to herein as the "Petition Date Allocation Method").

These arguments lay in the language of the Intercreditor Agreement,[3] the Security Agreement,[4] and the confirmed Plan of Reorganization (defined below as the "New Plan").  This Court was called upon to decide this issue once before and held that the

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them below and in the Court's *Allocation Opinion*. *Delaware Trust Co. v. Wilmington Trust, N.A. (In re Energy Future Holdings Corp.)*, 546 B.R. 566 (Bankr. D. Del. 2016) (this opinion will be referred to herein as the "*Allocation Opinion*" and the short citation will be referred to herein as "*Allocation Opinion*, 546 B.R. at page").

[3] *Declaration of Hugh K. Murtagh* (Adv. D.I. 58) (the "Murtagh Dec."), Exh. A (Amended and Restated Collateral Agency and Intercreditor Agreement, dated Oct. 10, 2007 (as later amended and restated) (hereinafter, the "Intercreditor Agreement")).  Docketed items in the above-captioned adversary action will be referred to herein as "Adv. D.I. #" and items docketed in the main bankruptcy case will be referred to herein as "D.I. #."

[4] Murtagh Dec., Exh. L (Security Agreement) (hereinafter the "Security Agreement")).

Petition Date Allocation Method would be used to distribute the amounts between and among the First Lien Creditors (as defined in more detail below, the "*Allocation Opinion*") partially based on the terms of the then confirmed, but not yet effective plan of reorganization (as later defined as the "First Plan"). The *Allocation Opinion* was appealed by Delaware Trust Company ("DTC"), in its capacity as TCEH First Lien Indenture Trustee.

The First Plan did not go effective. As such, the TCEH Debtors presented the New Plan, which was subsequently confirmed by the Court and consummated by the TCEH Debtors. DTC filed a motion to vacate partially the *Allocation Opinion*. Although filing a notice of appeal divests the trial court over control over aspects of the case involved in the appeal, this Court found that Federal Rule of Bankruptcy Procedure 8008 was applicable because the motion to vacate raised substantial issues as the *Allocation Opinion* was based, in part, on the First Plan that did not go effective and now there was a confirmed and effective New Plan. Thereafter, the District Court remanded the dispute back to this Court for further proceedings, although it retained jurisdiction over the appeal. Thus, this Court is now called upon once again to analyze the dispute based, in part, on the terms of the New Plan.

As set forth in more detail below, the Court finds that the terms of the First Plan, as compared to the New Plan, have not significantly changed. Furthermore, the Court finds that Section 4.1 of the Intercreditor Agreement is not implicated by the terms of the New Plan. Thus, distributions under the New Plan should be on a *pro rata* basis pursuant

to the Bankruptcy Code rather than pursuant to Section 4.1 of the Intercreditor Agreement.  Thus, the Court once again finds that the Petition Date Allocation Method should be used to distribute the funds between and among the First Lien Creditors.

## JURISDICTION

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be so in the context of this adversary proceeding.  This is a core proceeding pursuant to 11 U.S.C. § 157(b) and the order and opinion in *Delaware Trust Company v. Wilmington Trust, N.A.*, 534 B.R. 500 (S.D.N.Y. 2015) (as discussed in more detail in the *Allocation Opinion*).

However, jurisdiction over the appeal of this Court's *Allocation Opinion*, as defined below, was expressly reserved by the United States District Court for the District of Delaware and the matter was remanded to this Court pursuant to Federal Rule of Bankruptcy Procedure 8008.[5]

## FACTUAL BACKGROUND

### A.    General Background Related to Bankruptcy Case

On April 29, 2014 (the "Petition Date"), Texas Competitive Electric Holdings ("TCEH") and its parent Energy Future Competitive Holdings ("EFCH," collectively with TCEH and its debtor subsidiaries, the "TCEH Debtors") and certain affiliates

---

[5] *Order* (D. Del. 16-189, Nov 23, 2016, D. Del. D.I. 57); Adv. D.I. 139.

(collectively, the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code in this Court.

## A. Procedural Background

DTC commenced this proceeding to seek, among other relief, declarations that Section 4.1 of the Intercreditor Agreement (a) governs the allocation among TCEH First Lien Creditors of distributions to be made under any confirmed and consummated chapter 11 plan involving the TCEH Debtors, and (b) if applied, requires such distributions to be allocated based on the relative amounts owning to the TCEH First Lien Creditors on the date of distribution, including accrued but unpaid post-petition interest regardless of whether such interest was allowed or allowable in the Chapter 11 Cases (the "Post-Petition Interest Allocation Calculation").

On March 22, 2016, this Court ruled in its "Allocation Order" and accompanying *Allocation Opinion* that, among other things, Section 4.1 of the Intercreditor Agreement would not govern allocation of distributions, if any, when made upon the subsequent consummation of the plan confirmed in December 2015 (the "First Plan").  On March 24, 2016, DTC appealed the Allocation Order.

Thereafter, the First Plan was rendered "null and void."  Subsequently, the TCEH Debtors filed a new plan (the "New Plan").[6]  Although also contemplated in the First Plan, thereafter, the Internal Revenue Service (the "IRS") issued a Private Letter Ruling ("PLR") making various tax rulings, which modified the transactions set forth in the New

---

[6]  *See* D.I. 8355.

Plan. Shortly thereafter, the Debtors filed a revised version of the New Plan,[7] which was later confirmed and went effective.[8]

DTC filed a motion to vacate partially the Allocation Order pursuant to Federal Rule of Bankruptcy Procedure 9024 and Federal Rule of Civil Procedure 60(b),[9] which this Court granted, in part, pursuant to Federal Rule of Bankruptcy Procedure 8008, and requested that the District Court remand the case to the Bankruptcy Court for further proceedings as the Allocation Order and *Allocation Opinion* were premised on the First Plan, which was replaced by the New Plan.[10] Subsequently, the District Court remanded the case back to this Court, while retaining jurisdiction over the pending appeal.[11]

Thereafter, the Court entered a scheduling order for the adversary parties to brief whether the Court's analysis in the Allocation Order and *Allocation Opinion* should be modified in light of the underlying changes between the First Plan and the New Plan.[12] This matter is fully briefed[13] and the Court heard oral argument on April 26, 2017. This is the Court's Opinion thereon.

---

[7] D.I. 9199.

[8] D.I. 9421 and 9742.

[9] Adv. D.I. 122.

[10] Adv. D.I. 139.

[11] Adv. D.I. 141.

[12] Adv. D. I. 152.

[13] Adv. D.I. 150, 154, 155, and 157. The Court also granted the Intervenor's motion to file a Surreply. Adv. D.I. 161.

**B. Factual Background Related to Adversary Action**

    **i.    Credit Agreement and Debt Issuance**

As of the Petition Date, the TCEH Debtors had approximately $25.6 billion in principal amount of first lien debt (the "First Lien Debt") including:

> (i) Approximately $22.6 billion of term loan and revolving loan debt (the "First Lien Bank Debt") under a credit agreement dates as of October 10, 2007 (as amended in 2009, 2011 and 2012, the "Credit Agreement") among various parties, including Wilmington Trust, N.A., as successor administrative agent ("Administrative Agent") and successor collateral agent ("Collateral Agent");
>
> (ii) Approximately $1.75 billion of 11.50% senior secured notes (the "First Lien Notes" held by "First Lien Noteholders") issued under an indenture dated as a of April 19, 2011 (as amended, the "First Lien Notes Indenture"), for which plaintiff Delaware Trust serves as indenture trustee; and
>
> (iii) Approximately $1.23 billion of debt outstanding under certain first lien interest rate swap agreements and secured hedge and power sales agreements (the "First Lien Swap and Hedges" held by "First Lien Swap and Hedge Holders").

The First Lien Bank Debt, the First Lien Notes, and the First Lien Swaps and Hedges (collectively, the "First Lien Claims" and the holders of First Lien Claims, the "First Lien Creditors") were secured by liens on collateral granted pursuant to (i) the Security Agreement, dated as of October 10, 2007, as amended and restated as of August 7, 2009 (the "Security Agreement"), among TCEH, certain subsidiaries of TCEH, and Citibank, N.A., as initial collateral agent and (ii) the Pledge Agreement, dated as of October 10, 2007, as amended and restated as of August 7, 2009 (the "Pledge Agreement"), among EFCH, TCEH, and Citibank, N.A., as initial collateral agent. The

collateral securing all of the First Lien Claims includes substantially all of the assets of the TCEH Debtors (the "Collateral") and proceeds of any Collateral.[14]

### ii.    The Intercreditor Agreement

The relationship among the First Lien Creditors with respect to their shared collateral is governed by the Collateral Agent and Intercreditor Agreement which was executed in 2007 (as amended in 2009, the "Intercreditor Agreement," and collectively with the Security Agreement and the Pledge Agreement, the mortgages, and the Second Lien Intercreditor Agreement (as defined herein), the "Security Documents") and is governed by New York law.[15]

Section 2.1 of the Intercreditor Agreement provides that the scope and rank of the property rights that each First Lien Creditor maintains in the First Lien Collateral proceeds is *pari passu* as among the First Lien Creditors, "except as otherwise provided in Section 4.1."[16]

---

[14]  *See* Security Agreement, § 2; Murtagh Dec., Exh. O (Pledge Agreement § 2 (hereinafter, the "Pledge Agreement")).

[15]  Intercreditor Agreement, § 9.6(a).

[16]  *Id.* at § 2.1.  Section 2.1 states in full:

> <u>Pari Passu</u>.  As among the [First Lien Creditors], all [First Property] Liens on the [First Priority] Collateral shall rank *pari passu*, no [First Lien Creditor] shall be entitled to any preferences or priority over any other [First Lien Creditor] with respect to the [First Lien] Collateral (except otherwise provided in Section 4.1) and the [First Lien Creditors] shall share in the [First Lien] Collateral and all Proceeds thereof in accordance with the terms of this Agreement.

Intercreditor Agreement, § 2.1.  "Proceeds" is defined

> as such term defined in Article 9 of the UCC and, in any event, shall include with respect to any Grantor, any consideration received from the sale, exchange, license, lease or other disposition of any asset or property that constitutes Collateral, any value received as a consequence of the

Section 4.1 of the Intercreditor Agreement sets out the waterfall for the disposition of collateral or proceeds of collateral received in connection with the sale or other disposition of, or collection on, such collateral or proceeds upon exercise of remedies under the Security Documents by the Collateral Agent to and among the First Lien Creditors (the "Waterfall").  Specifically, Section 4.1 provides:

> Application of Proceeds. Regardless of any Insolvency or Liquidation Proceeding which has been commenced by or against the Borrower or any other Loan Party, Collateral or any proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies under the Security Documents by the Collateral Agent shall be applied in the following order . . . :
>
> With respect to all Collateral other than Deposit L/C Collateral:
>
> [F]irst, on a pro rata basis, to the payment of all amounts due to the Collateral Agent, any Agent, and the Issuing Lenders . . . under any of the Financing Documents;
>
> [S]econd, on a pro rata basis to any Secured Party which has advanced or paid any fees to any Agent or Issuing Lender which has not been previously reimbursed;
>
> [T]hird, on a pro rata basis, to the payment of, without duplication, (a) all principal and other amounts *then due and payable* in respect of the Secured Obligations (including Cash Collateralization of all outstanding Revolving Letters of

---

possession of any Collateral and any payment received from any insurer or other Person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature of any asset or property that constitutes Collateral, and shall include (a) all cash and negotiable instruments received by or held on behalf of the Collateral Agent, (b) any claim of any Grantor against any third party for [claims dealing with Licenses, Trademarks, and Copyright] . . . and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

Security Agreement, § 1 (d) "Proceeds."

Credit) and (b) the payment of Permitted Secured Hedge Amounts *then due and payable* to any Secured Commodity Hedge Counterparty under any Secured Commodity Hedge and Power Sales Agreement; and

[L]ast, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full in cash, to the Loan Parties or as otherwise required by applicable law.[17]

Section 4.2 of the Intercreditor Agreement places certain limitations on cash

payments from Collateral proceeds post-default and provides:

After (a) the commencement of any Insolvency or Liquidation proceeding in respect to any Loan Party . . . no payment of cash (or the equivalent of cash) shall be made from the proceeds of Collateral by any Loan Party to the Collateral Agent for the benefit of any Secured Party, except as provided for in Section 4.1.

The definition of "Secured Obligations" includes:

[C]ollectively, (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any [Obligor] arising under any Loan Document or otherwise with respect to an Loan, Posting, Advance or Letter of Creditor or under any Secured Cash Management Agreement, Secured Commodity Hedge and Power Sales Agreement or Secured Hedging Agreement . . . whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any [Obligor] of any proceeding under any bankruptcy or insolvency law naming such [Obligor] as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Secured Obligations of the [Obligors] under the Loan Documents include (a) the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any [Obligor]

---

[17] Intercreditor Agreement, § 4.1 (emphasis added) (hereinafter, "Section 4.1").

under any Loan Document and (b) all obligations of every nature outstanding under any Additional Obligations, whether fixed or contingent, matured or unmatured, **in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding. "Secured Obligations" shall include, without limitation, interest accruing at the then applicable rate provided in the applicable Financing Document after the maturity date of the relevant Secured Obligations and any Post-Petition Interest.**[18]

Furthermore, the Intercreditor Agreement specifies that any payments of cash or its equivalents made after the commencement of a bankruptcy case with respect to any Obligor must be made in accordance with Section 4.1. Specifically, Section 4.2 provides, in relevant part:

> Limitations on Payment Post Default. After (a) the commencement of any Insolvency or Liquidation Proceeding in respect of any [Obligor] . . ., no payment of cash (or the equivalent of cash) shall be made from the proceeds of [First Lien] Collateral by any [Obligor] to the [First Lien] Collateral Agent for the benefit of any Secured Party, except as provided for in Section 4.1.[19]

The term Secured Obligations does not appear in Section 4.1 of the Intercreditor Agreement. The Intercreditor Agreement also confirms the rights of the First Lien Creditors relative to one another continue regardless of a bankruptcy proceeding.[20]

---

[18] Intercreditor Agreement, §1.1, definition of "Secured Obligations" (emphasis added). The term "Post-Petition Interest" is defined to mean "any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency or Liquidation Proceedings, whether or not allowed or allowable in any such Insolvency or Liquidation Proceeding." *Id.* at §1.1, definition of "Post-Petition Interest."

[19] Intercreditor Agreement § 4.2.

[20] Section 8.3 provides that "[a]ll rights, interests, agreements and obligation of each of the Collateral Agent, the Administrative Agent and the Secured Parties, respectively, hereunder shall remain in full force and effect irrespective of . . . (d) the commencement of any Insolvency or Liquidation proceeding in respect of [an Obligor]." Intercreditor Agreement, § 8.3. Section 9.2 provides that "[t]he terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding." Intercreditor Agreement, § 9.2(a).

Certain rights under the Intercreditor Agreement, such as the right to direct the Collateral Agent to exercise remedies and the right to consent to amendments, are restricted to Required Secured Parties.[21]  Required Secured Parties is defined as the secured parties holding more than 50% of the sum of the outstanding amount under the First Lien Bank Debt and the Eligible Hedge Voting Amount under the Secured Commodity Hedge and Power Sales Agreement (as such terms are defined in the Intercreditor Agreement).[22]  It does not include the First Lien Noteholders.

TCEH also issued certain second lien notes.  The relationship between the First Lien Creditors and the holders of the second lien notes is governed by a second lien intercreditor agreement dates as of October 6, 2010 (the "Second Lien Intercreditor Agreement"), among the TCEH Debtors, the Collateral Agent, the Bank of New York Mellon Trust Company, N.A. as initial second priority representative.

### iii.    Cash Collateral

On or around the Petition Date, the TCEH Debtors sought authorization to use cash collateral and approval of an adequate protection package (the "Cash Collateral Motion).[23]  The Court entered an interim cash collateral order, which provided that the First Lien Creditors were entitled to adequate protection to the extent of any diminution in value of their interests in Collateral in the form of, among other things, the Adequate Protection Payment calculated by apply a per annum rate equal to the LIBOR Rate + 450

---

[21] Intercreditor Agreement §§ 9.3 and 9.4.

[22] Intercreditor Agreement § 1.

[23] D.I. 71.

basis points to the "aggregate outstanding amount of Prepetition First Lien Obligations as of the Petition Date."[24]

Aurelius Capital Management ("Aurelius") filed an objection to the proposed final cash collateral order.[25]   The Aurelius objection concerned the allocation of Adequate Protection Payments among the First Lien Creditors.  Specifically, Aurelius argued that the Adequate Protection Payment should be allocated among the First Lien Creditors in a manner that takes into account the hypothetical accrual of post-petition interest under the various tranches of First Lien Debt, with a recalculation each month to reflect each tranche's variation in claim size (the "Post-Petition Interest Allocation Method").  Several First Lien Bank Debt Holders opposed Aurelius's allocation bid.  This Court received briefs and heard argument on the allocation dispute.  As it happened, this Court informed the parties that it was not prepared, at that point, to resolve the monthly payments allocation issue.  As a result, this Court ordered that the difference between the Post-Petition Interest Allocation Method and the Petition Date Allocation Method be placed in escrow pending further order of this Court or another court of competent jurisdiction (which led to the First Lien Noteholder Action in the SDNY discussed *supra*).

Thereafter, in response to this Court's ruling, the Debtors and the Ad Hoc Committee of TCEH First Lien Creditors (the "Ad Hoc Committee") agreed to language in the Final Cash Collateral order (i) fully reserving all First Lien Creditors' rights to

---

[24]  D.I. 324 (the "Interim Cash Collateral Order") at ¶ 5.

[25]  D.I. 632.

dispute the Petition Date Allocation Method or the Post-Petition Interest Allocation Method should be applied to the allocation of Adequate Protection Payments and (ii) establishing an escrow account funded by the TCEH Debtors from ratable deductions of the Adequate Protection Payments each month with an amount equal to the difference between the Petition Date Allocation Method and the Post-Petition Interest Allocation Method (such difference, the "Holdback Amount").  The Court approved the final cash collateral order (the "Final Cash Collateral Order").[26]  The Final Cash Collateral Order requires that the Adequate Protection Payments be made to the Administrative Agent on behalf of the holders of First Lien Bank Debt, to the First Lien Notes Trustee on behalf of the holders of the First Lien Notes, and directly to the holders of First Lien Swaps and Hedges.

As the Holdback Amount is not implicated by the differences between the First Plan versus the New Plan, these arguments were not renewed by DTC in the current briefs.  However, for completeness, the Court includes the Cash Collateral dispute in this factual history.

### iv.    Proofs of Claims

On or about October 15, 2014, Morgan Stanley filed a Proof of Claim in these bankruptcy proceedings[27] (the "Morgan Stanley Claim").  In the Morgan Stanley Claim, Morgan Stanley asserts that, pursuant to the ISDA Master Agreement, "the amount

---

[26] D.I. 855 at ¶¶ 5 and 6.

[27] Claim Nos. 5304-5343. *See also* DTC Answering Brief, Adv. D.I. 68, App. A.

payable by TCEH to [Morgan Stanley]" is $226,465,000, which "continues to accrue interest at the Applicable Rate (as defined in the Master Agreement.)."  Morgan Stanley also states that the claim includes "interest from the Early Termination Date through the [post-petition] claims bar date of October 27, 2014, as well as amounts due for interest that continues to accrue thereafter. . . . "

On or about October 24, 2014, the First Lien Administrative Agent (Wilmington Trust) filed a Proof of Claim on behalf of the holders of the First Lien Bank Debt, including Titan.[28]  Wilmington Trust asserts that "Obligations" under the Credit Agreement and any other Transaction Documents – including "interest and fees that accrue in a bankruptcy case of a Debtor, regardless of whether such interest and fees are allowed claims in the bankruptcy case" – became "due and payable immediately" upon default.[29] The First Lien Collateral Agent also filed a proof of claim with similar assertions.[30]

On or about October 27, 2014, J. Aron filed a proof of claim.[31]  J. Aron's proof of claim includes "interest at the Default Rate."[32]

v.    **The PSA and the First Plan**

On August 10, 2015, the Debtors filed a motion seeking approval of a plan support agreement that was negotiated with the support of the majority of the TCEH Debtors'

---

[28] Claim No. 7489.  *See also* DTC Answering Brief, Adv. D.I. 68, App. B.

[29] *Id.* at ¶¶ 7.

[30] Claim No. 7488.  *See also* DTC Answering Brief, Adv. D.I. 68, App. C.

[31] Claim No. 9555. *See also* DTC Answering Brief, Adv. D.I. 68, App. D.

[32] *Id.* at 3.

secured and unsecured creditors.[33]  The Bankruptcy Court approved the TCEH Debtors' entry into the plan support agreement on September 18, 2015 (the "PSA").[34]  Shortly thereafter, the Debtors filed the plan and related disclosure statement.[35]

Under the First Plan, holders of First Lien Claims were to receive (i) the common stock of Reorganized TCEH ("Reorganized TCEH Common Stock"); (ii) 100% of the TCEH Debtors' cash on-hand ("Cash On-Hand") and Reorganized TCEH's new debt or the cash proceeds of such new debt (collectively, the "Reorganized TCEH Debt Funds"); (iii) the rights to purchase $700 million of EFH common stock under a rights offering and the EFH common stock purchased pursuant to the exercise of those rights (the "Rights"); (iv) certain stock in TCEH's ultimate parent (the "Assigned C5 Rights") and any excess cash that remains after distributions are made to the holders of general unsecured claims against certain of the TCEH Debtors (the "Cash-Out Election Pool Excess Cash"); and (v) the rights to receive payments pursuant to a tax receivable agreement entered into by Reorganized TCEH if any (the "TRA Rights") (collectively, the "First Plan Distributions").[36]

---

[33]  D.I. 5248.

[34]  D.I. 6097.  The PSA prohibited the Collateral Agent form supporting any alternative restructuring plan that lacks specified terms.  PSA § 6.1.  Further, the Collateral Agent is effectively barred from taking any action inconsistent with the PSA and the Plan because the parties to the PSA are obligated to "promptly direct" the Collateral Agent to cease and refrain from taking any such action in the event it were to attempt to do so.  PSA §§4.10(f), 5.4(f).

[35]  D.I. 6123 (as later amended, the "Plan") and 6124 (the "Disclosure Statement").

[36]  *See* Plan Art. III.B.28(c)(i-v).

The First Plan provided that all First Plan Distributions would be distributed in accordance with the Petition Date Allocation Method, except that the First Plan Distributions in (numbering consistent with numbering above) (i) Reorganized TCEH Common Stock, (ii) Reorganized TCEH Debt Funds, and (v) TRA Rights above would be distributed in accordance with a final order in this action that would determine the appropriate allocation methodology.

### vi.    Allocation Order and *Allocation Opinion*

On March 11, 2016, the Court issued the *Allocation Opinion* and Allocation Order. Therein, the Court held that in order for DTC to prevail, DTC must show that each element of Section 4.1 is met.  The elements are:

> (i) Collateral or any proceeds of Collateral are to be distributed to the First Lien Creditors;
>
> (ii) the Collateral must be "received" by the Collateral Agent;
>
> (iii) the Collateral or the proceeds of Collateral must have resulted from a sale or other disposition of, or collection on, such Collateral; and
>
> (iv) the sale, disposition, or collection must have resulted from the exercise of remedies under the Security Documents.
>
> As Section 4.1 is the only section in the Intercreditor Agreement regarding application and distribution of proceeds, if any of these initial requirements are not met, then the Adequate Protection Payments and the Plan Distributions would be distributed outside of the Intercreditor Agreement (i.e. pursuant to the terms of the Bankruptcy Code, orders of this Court, and the Plan).[37]

---

[37] *Allocation Opinion*, 546 B.R. at 578.

The Court found that neither the First Plan distributions nor the adequate protection payments constituted "payment of collateral", that the collateral was not "received" by the Collateral Agent; and that the sale, disposition or collection did not result from the exercise of remedies under the Security Documents.  Thus, in the *Allocation Opinion*, the Court found that DTC could not meet any of the initial elements of Section 4.1 based upon the First Plan's distributions.[38]  Although Section 4.1's requirements have not changed, this Court must look at the distributions contemplated by the New Plan and determine whether DTC meets Section 4.1's requirements thereunder.

### vii.    New Plan and Distributions Thereunder

The New Plan provides the following mechanisms for Distributions to TCEH First Lien Holders:

1.  Before the TCEH Effective Date, TCEH forms Reorganized TCEH.

2.  On the TCEH Effective Date, TCEH transfers all of its interests in its subsidiaries to the newly formed company (the "Contribution"), "in exchange for" 100% of the new company's stock and either the net cash proceeds of debt to be issued by the new company and/or all or a portion of the debt itself.

3.  After the Contribution, the new company contributes all of its equity in specific "Contributed TCEH Debtors" to the "Preferred Stock Entity" in exchange for the latter's common stock and the Reorganized TCEH Sub Preferred Stock.  The new company then sells all of the Reorganized TCEH Sub Preferred Stock to

---

[38] *Allocation Opinion*, 546 B.R. at 578-584.

third parties in exchange for cash. The new company then distributes the proceeds of the sale to TCEH.[39]

4. After the Spin-Off Preferred Stock Sale, the new company converts from a Delaware limited liability company to a Delaware corporation.

5. Immediately following the Spin-Off Preferred Stock Sale, Reorganized TCEH converts from a Delaware limited liability company into a Delaware corporation (the "Reorganized TCEH Conversion").

6. Following the Reorganized TCEH Conversion, TCEH distributes the consideration it received for the transfer of its assets, namely the new company stock and net cash proceeds of the new company's debt, and the Preferred Stock Sale to the TCEH First Lien Creditors.[40]

On August 29, 2016, the Court confirmed the New Plan.[41] The New Plan was consummated on October 3, 2016.[42] Pursuant to the New Plan, New Plan Distributions representing a portion of the amount at issue in this dispute were either placed into reserve or released to certain TCEH First Lien Creditors that provided undertakings obligating them to disgorge a portion of the New Plan Distributions provided a final non-appealable decision is issued adopting the Post-Petition Interest Allocation Method.

---

[39] *See* New Plan Art. I.A.373 (definition of "Spin-Off Preferred Stock Sale," and referred to herein as the "Spin-Off Preferred Stock Sale").

[40] New Plan Art. IV.B.2.

[41] D.I. 9421.

[42] *See* D.I. 9742.

### viii.    Side-by-Side Comparison Between the First Plan and the New Plan

The Intervenors assert that the First Plan's distributions and the New Plan's distributions are substantially similar in all material respects.  The following chart is a side-by-side comparison between the First Plan and the New Plan:

|  | First Plan | New Plan |
|---|---|---|
| 1. | 100% of Reorganized TCEH Common Stock.  First Plan, Art. III.B.28(c)(i). | 100% of Reorganized TCEH Common Stock.  New Plan, Art. III.B.29(c)(i)(A). |
| 2. | 100% of cash on hand at TCEH and new debt (or cash proceeds thereof) issued by Reorganized TCEH and cash proceeds from preferred stock sale, in each case subject to certain limitations. First Plan, Art. III.B.28(c)(ii). | 100% of cash on hand at TCEH and new debt (or cash proceeds thereof) issued by Reorganized TCEH and cash proceeds from preferred stock sale, in each case subject to certain limitations. New Plan, Art. III.B.29(c)(i)(B). |
| 3. | Rights to purchase $700 million of new EFH common stock.  First Plan, Art. III.B.28(c)(iii). | Proceeds from $700 million TCEH Settlement Claim.  New Plan, Art. III.B.29(c)(i)(D). |
| 4. | TRA rights (if any). First Plan, Art. III.B.28(c)(v). | Spin-off TRA rights (if any). New Plan, Art. III.B.29(c)(i)(C). |

The Intervenors also stress that the Spin-Off is the same in all material respects and contains the same six steps of Spin-Off (outlined above).  The Intervenors note that the Private Letter Ruling issued by the IRS, contemplated by both the First Plan and the New Plan, did not require any substantive changes in the steps of the Spin-Off as described under the First Plan and the New Plan.

## ANALYSIS[43]

### A.    Parties' Arguments

DTC advances several arguments in support of its motion.  First, DTC asserts that the New Plan Spin-Off constitutes a "sale, or other disposition of, or collection on" the TCEH First Lien Creditors' Collateral or proceeds thereof.  DTC argues that the New Plan Spin-Off is not a simple debt-for-equity reorganization because no step-up in basis would have occurred as it does in the New Plan Spin-Off.  DTC further asserts that *once the Court determines* that the New Plan Spin-Off is a "sale of disposition" of the TCEH First Lien Collateral, the remaining arguments against application of Section 4.1 fail as well.  DTC argues that the consideration (i.e. New Plan Distributions) generated by a series of transactions that hinge on a "sale or disposition" of the TCEH First Lien Collateral constitutes the "proceeds" of that Collateral and that consummation of the New Plan Spin-Off requires an exercise of the remedies by the Collateral Agent.  DTC further urges the Court to find that Section 4.1 of the Intercreditor Agreement embodies the "Post-Petition Interest Allocation Method."   DTC argues that post-petition interest was allowable as between First Lien Lenders whether or not "allowed or allowable" as against the Debtors.  Finally, DTC states that based on the "rule of explicitness," the Court should adopt the Post-Petition Interest Allocation Method as it was contemplated by the parties who entered into the Intercreditor Agreement.

---

[43]  This Opinion only addresses the arguments of the parties related to the New Plan.  The portion of the *Allocation Opinion* addressing other issues such as the Cash Collateral Order and whether the Court has authority to enter a final order are incorporated herein by reference.

The Intervenors argue that there are no differences between the First Plan and the New Plan that would justify the Court revisiting its prior holding. The Intervenors assert that the Court should deny DTC's 60(b) Motion because there are no difference between the First Plan and the New Plan and DTC is only raising arguments that it could have raised – but failed to raise- in connection with the First Plan. The Intervenors continue that the Collateral Agent has still taken no action that would trigger Section 4.1 of the Intercreditor Agreement, as there was no auction, no bidding procedures, and no third-party purchase agreement for the reorganization of TCEH. The Court's prior conclusions, including "Reorganized TCEH is not a third-party purchaser" and that the "Internal Spin-Off Transaction" was not a sale, remain true in the New Plan. This position is confirmed by the IRS's private letter rulings, which recognized that the reorganization satisfied the "continuity of interest" requirement under the applicable tax rules because the First Lien Creditors properly are viewed as *de facto* equity holders of the TCEH Debtors. Under the New Plan, the TCEH Debtors' assets were *not* being transferred to a "third party," but rather remained with the "owner[s] of the enterprise," who are the same parties that had equity exposure to the TCEH Debtors and the TCEH Debtors' assets on the Petition Date. As to the interest allocation, the Intervenors assert that the payment waterfall in Section 4.1 applies only to Secured Obligations that are "due and payable" and "due and owing" by the TCEH Debtors. The Intervenors continue that the post-petition interest sought by DTC is not "due and payable" or "due and owing" because

the First Lien Creditors were undersecured during the Chapter 11 cases and on the Effective Date.

## B. Contract Interpretation

As discussed in the *Allocation Opinion*, under New York law, which governs the Intercreditor Agreement,[44] the Court need not look "outside the four corners" of a complete document to determine what the parties intended.[45]  Here, neither party has alleged that the Intercreditor Agreement is an incomplete document, so it is not necessary to resort to extrinsic evidence to interpret it. Moreover, neither party contends that any term in the Intercreditor Agreement is ambiguous—instead, each party relies on its own "plain reading" in reaching competing results. A contract is not ambiguous merely because the parties offer different constructions of the same term.[46]  As the Court held in the *Allocation Opinion*, the Court finds that the Intercreditor Agreement is not ambiguous.

As the Court reaches the conclusion that the Intercreditor Agreement is unambiguous, the Court then relies on long-recognized canons of interpretation to determine its meaning.  First, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing."[47]  Second, should there be an inconsistency

---

[44] Intercreditor Agreement, § 9.10.

[45] *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990).

[46] *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

[47] *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) (internal quotation marks and citation omitted).

between a specific and general provision of a contract, the specific controls.[48]  Third, "[a]

reading of the contract should not render any portion meaningless."[49]

## C.  Differences Between First Plan and New Plan

The Intervenors assert that DTC should have addressed the supposed effect of the

New Plan on the Court's prior decision; yet pointed out no differences between the First

Plan and the New Plan, choosing instead to raise arguments that it could have raised, but

failed to raise, in connection with the First Plan.[50]  The Intervenors assert that Rule 60(b)

is not read liberally to give DTC an opportunity to re-litigate its case, revisit issues the

court has already considered in its judgment, advance new arguments, or present facts

that were otherwise available at the time of this Court's *Allocation Opinion*.

DTC responds that this Court recognized in its Rule 8008(a)(3) indicative order

that the *Allocation Opinion* and Allocation Order "w[ere] premised on the First Plan,

which is now null and void, and as the terms of the New Plan are different . . . the

intercreditor dispute would need to be examined under the provisions of the New

Plan."[51]  Thus, DTC views these supplemental briefs as a fresh slate.

The Court views the *Memorandum Order* and the subsequent *supplemental* briefs as

being limited to the changes between the First Plan and the New Plan.  It would be a

---

[48]  *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *Waldman v. New Phone Dimensions, Inc.*, 487 N.Y.S.2d 29, 31 (N.Y. App. Div. 1985).

[49]  *See Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213 (N.Y. 2007) (quotation marks and citations omitted); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms.").

[50]  *See* Dec. 1, 2016 Hr'g Tr. 46:6-47:3.

[51]  *Memorandum Order* (D.I. 139) at ¶ 5.

waste of judicial resources, especially while the District Court retains jurisdiction over the pending appeal, to begin its analysis anew.    Rather, the Court stands behind its analysis in the *Allocation Opinion*.

The Court agrees with the Intervenors that the relevant changes between the First Plan and the New Plan are minimal at best.    Furthermore, the Court finds that DTC has asserted virtually identical arguments as were addressed by the *Allocation Opinion* as well as new arguments that could (and should) have been raised in connection with the First Plan.    However, the Court will analyze these arguments as applied to the New Plan for completeness of the record.    The Court hereby adopts its *Allocation Opinion* and the findings therein and incorporates them *in toto*.

## D.  Conditions of Section 4.1 of the Intercreditor Agreement

### i.    "Sale, Disposition of, or Collection on Collateral"

DTC asserts that the New Plan Spin-Off is *not* a simple debt-for-equity reorganization.    DTC continues that the New Plan Spin-Off is a complex web of transactions, including a "Preferred Stock Sale," which accomplishes a "Basis Step-Up" by the exchange of TCEH First Lien Collateral from Reorganized TCEH to the Preferred Stock Entity, a third party, in return for the latter's common stock and preferred stock, which is immediately sold to third party investors.    DTC alleges that the changes reflected in the New Plan were demanded by the TCEH Supporting First Lien Creditors in order to accomplish the Basis Step-Up per the ruling in the PLR.    DTC continues that the PLR stated that in order for the basis Step-Up to occur, the New Plan Spin-Off transactions

has to occur in a specific order and include a realization event in the explicit form of a "sale or disposition" of the Collateral to an entity that could not be deemed to be owned or controlled by the Debtors or the TCEH First Lien Creditors at the time of such "sale or disposition."  DTC continues that the New Plan Spin-Off could not be accomplished with the Separation Agreement.[52]  DTC asserts that the Separation Agreement details the specific agreement between the E-Side Debtors and Reorganized TCEH regarding which TCEH assets would be acquired and which assets would be left behind, which TCEH liabilities would be assumed and which liabilities would be excluded.  DTC continues that the Separation Agreement also contains the parties' mutual agreements that all "bulk-sale" and "bulk transfer" rights would be waived and that the assets would be acquired "as is, where is."[53]  Thus, DTC asserts that the New Plan Spin-Off is a "sale or disposition" of assets.

Intervenors respond that the First Plan provided for a Preferred Stock Sale but does not provide for the "sale or other disposition of, or collection on" Collateral as required by Section 4.1 of the Intercreditor Agreement.  The Intervenors assert that the Collateral continues to exist after the Effective Date of TCEH's plan and continues to be owned by Reorganized TCEH, a continuation of TCEH.  The Intervenors argue DTC's focus on the Basis Step-Up is irrelevant because the TCEH Debtors' tax basis in Collateral has no relationship to the realizable value of the Collateral in the hands on the secured

---

[52] Bankr. D.I. 9100.

[53] Separation Agreement §§ 2.1(c) and 4.4(a).

creditor following its foreclosure or sale.  The Intervenors explain that the TCEH Debtors *wanted* to trigger a taxable gain to increase the basis of the assets to be held by Reorganized TCEH to provide tax savings to the company in future years through increased depreciation and amortization deductions.  The Intervenors continue that the step-up in basis did not create a net tax liability because it was the result of taxable gain that in turn was absorbed by the company's net operating losses.  The Intervenors continue that as the intent was to render an internal transfer taxable, the parent corporation can break control of the subsidiary by issuing a new class of contingent-voting stock to a third party while still retaining full practical control over the assets.  This type of transaction is sufficient to "break control" for tax purposes even if the total value of the new contingent-voting class of stock is *de minimis* – which is what occurred through TCEH's plan.  The Intervenors also note that the step-up affected only a portion of TCEH's assets and that the $70 million third party preferred stock investment represented approximately 0.6% of TCEH's $11.6 billion enterprise value.   The Intervenors continue that after the Preferred Stock Sale, TCEH transferred additional TCEH assets and the Preferred Stock Entity's common stock to Reorganized TCEH in exchange for Reorganized TCEH's common stock, TRA Rights, and the assumption by Reorganized TCEH of the New TCEH DIP Facility (as defined in the New Plan). Thereafter, TCEH then distributed the Reorganized TCEH common stock, the Preferred Stock Proceeds, the Settlement Claim, and the TRA Rights to the First Lien Creditors in exchange for their claims.

DTC responds that the Preferred Tax Sale embodied in the New Plan was a requirement for the TCEH First Lien Creditor's consent to the New Plan, thus, it was not an insignificant portion of the New Plan.

As noted by the Intervenors, the economic reality is that TCEH (and eventually its successor, Reorganized TCEH) remained the holder of 100% of the common stock of the Preferred Stock Entity at all relevant times – so there was no sale of assets to a third party, nor were there any proceeds of Collateral generated from such transaction.  The Preferred Stock Sale is *not* a change in ownership of the assets rather it is a step in a change of control.[54]  After the Preferred Stock Sale, the Preferred Stock Entity continued to be a member of the TCEH consolidated group for income tax reporting purposes, confirming that it was not sold to a "third party."  Reorganized TCEH is not a separate and unrelated party to TCEH, but its successor.[55]  As Judge Drain held in *Momentive*, "a secured creditor is not getting the proceeds of its collateral when it gets stock in the reorganized entity, unless, of course, that stock was paid by a third-party buyer in return for the debtor's assets comprising the collateral."[56]  This New Plan structure was created solely for tax purposes and without bidding procedures, an auction, and typical Section 363 sale

---

[54] In oral argument, DTC asserted that the "intermediate steps matter."  DTC gave the example of a section 363 sale where the pre-petition secured lender is the purchaser.  The Court agrees, the intermediate steps are indeed relevant when deciding whether there is a sale of assets.  However, the Preferred Stock Sale is not a sale of Collateral but rather a sale of control.  The TCEH First Lien Lender Creditor Collateral did not change and always remained with either TCEH or Reorganized TCEH.

[55] *Allocation Opinion*, 546 B.R. at 578 ("The Plan further creates a Reorganized TCEH, the successor to TCEH.").

[56] *In re MPM Silicones*, LLC, 518 B.R. 740, 756 (Bankr. S.D.N.Y. 2014) (hereinafter "*Momentive*") (citing 124 Cong. Rec., H11, 104 (Daily Ed. Sept. 28, 1978)).

attributes.  The Court is unwilling to metamorphize this tax structure into a "sale or disposition" of the TCEH Collateral.  Thus, there is no sale or disposition of the Collateral under the New Plan.

ii.    "Proceeds of Collateral"

DTC asserts that in the New Plan there was a sale of collateral and, thus, the matter *sub judice* is distinguishable from *Momentive*.[57]  In *Momentive*, DTC asserts that the collateral was neither sold nor disposed of, rather it vested in the reorganized debtor and continued to serve as the collateral to which the plaintiffs' liens attached following the reorganization.  DTC distinguished *Momentive* by arguing in the case *sub judice* the liens once held by the Collateral Agent for the benefit of all TCEH First Lien Creditors have been forever released in their entirety.  DTC asserts that the drafters of the Intercreditor Agreement meant for "proceeds" in Section 4.1 to be construed to include consideration resulting from a "sale or disposition" under applicable tax law.  More specifically, DTC continues that the use of $5.5 - $6 billion EFH Corp.'s net operating losses by TCEH to consummate the New Plan Spin-Off and offset the gain realized to achieve the Basis Step-Up was a disposition of the TCEH Collateral.

The Intervenors respond that, similar to the debt-for-equity swap in *Momentive*, the TCEH First Lien Creditors received Plan Distributions by application of the New Plan in exchange for their liens, not on account of the conversion of the Debtors' assets.  The Intervenors continue that there is no event here that has resulted in or will result in

---

[57]  518 B.R. 740 (Bankr. S.D.N.Y. 2014).

Reorganized TCEH losing ownership and control of the Collateral, such as a third-party sale or foreclosure.

In *Momentive*,[58] there was a debt-for-equity swap in the plan, where the common stock of the newly reorganized debtors was being distributed to lien holders. Judge Drain held that the lien holders did not have a lien on the newly issued stock and the newly issued stock was not part of the lien holders' collateral.[59] Judge Drain continued that the collateral did not change in any way as a result of the issuance and distribution of the new stock – therefore, to argue that the new stock received constituted proceeds of collateral would unfairly add to such collateral.[60] Judge Drain held that to hold that newly issued stock to be proceeds of collateral

> also would contradict the case law addressing whether a secured creditor receives the "indubitable equivalent" of its secured claim under section 1129(b)(2)(A)(iii) of the Bankruptcy Code if it receives stock in the reorganized enterprise as part of cramdown treatment under a chapter 11 plan. Obviously, if the stock were collateral proceeds to which the creditor's lien would attach, it would not be substitute collateral appropriate for analysis under the "indubitable equivalent" cramdown alternative in section 1129(b)(2)(2)(A)(iii).[61]

In its argument, DTC attempts to distinguish the *Momentive* decision arguing that this case is different because rather than issuing stock in TCEH to the First Lien Creditors

---

[58] *BOKF, N.A. v. JP Morgan Chase Bank, N.A. (In re MPM Silicones, LLC)*, 518 B.R. 740 (Bankr. S.D.N.Y. 2014) (hereinafter, "*Momentive*").

[59] *Momentive*, 518 B.R. at 754.

[60] *Id.* at 755-56.

[61] *Id.* at 756 (citations omitted).

under the Plan as part of a standard debt-for-equity swap as was done in *Momentive*, TCEH is instead selling preferred stock shares to third party creditors which are then contributed back to Reorganized TCEH.  The Court is not persuaded by this distinction.  This is not akin to a Section 363 sale, it is not subject to higher and better offers, and it is not permanently removing assets from Reorganized TCEH.  Reorganized TCEH's shares are akin to the shares distributed in *Momentive*.  This Court again adopts Judge Drain's holding as set forth above.  The TCEH Collateral does not change in any way (other than a Step-Up Basis for tax purposes) as a result of the Plan Distributions.  As in *Momentive*, the Plan Distributions are not "'proceeds of collateral' when it gets stock in the reorganized entity, unless, that stock was paid by a third-party buyer in return for the debtors' assets comprising the collateral."[62]  Here, no substitute for the Collateral was received by the TCEH First Lien Lenders through Plan Distributions.

---

[62] *Momentive*, 518 B.R. at 756.  As this Court held in its *Allocation Opinion*:

> DTC asserts that the Internal Spin–Off Transaction is a "sale."  In its argument, DTC attempts to distinguish *Momentive* from the case *sub judice*.  However, such distinction fails. DTC is elevating form over substantive in attempting to distinguish the debt-for-equity swap.  Nothing in the Plan states that Reorganized TCEH is "purchasing" the Collateral, Reorganized TCEH is not a third-party purchaser, and there is not an "economic event" that would create that sort of relationship.  Currently, TCEH is owner of the subsidiaries that will become part of Reorganized TCEH—so the "collateral" is moving from shares to assets, which is an irrelevant distinction for the purposes of evaluating the shift in Collateral.  In *Momentive*, Judge Drain held:
>
>> Very clearly, however, a secured creditor is not getting the proceeds of its collateral when it gets stock in the reorganized entity, unless, of course, that stock was paid by a third-party buyer in return for the debtor's assets comprising the collateral.
>
> The creation of Reorganized TCEH through the Plan, under these circumstances, does not elevate the Internal Spin–Off Transaction to a "sale."

### iii.    "Receipt by the Collateral Agent"

First, DTC makes the argument that Section 4.1 uses the word "by" only once in the relevant preamble language.  DTC continues that it cannot grammatically apply to both and, as such, the Intervenors cannot argue that there must be (i) an affirmative exercise of remedies by the Collateral Agent *and* (ii) that the Collateral Agent must receive the Collateral or its proceeds.  Second, DTC argues that even assuming that receipt by the Collateral Agent is a requirement, that requirement is effective subsumed by the language of the New Plan, which states that to the extent the Plan Distributions are determined to be Collateral or its proceeds, "such distributions shall be made to the TCEH First Lien Collateral Agent for further distributions to the Secured Debt Representatives."[63]  DTC submits that this is carefully negotiated language in the New Plan and essentially stipulated to the satisfaction of the requirement of Section 4.1.

The First Plan and the New Plan contain identical language stating that pro rata payments directly to the First Lien Creditors based on their allowed claims.  The First Plan and the New Plan state that payments would only be made to the Collateral Agent if the Court were to determine that the Plan Distributions constitute Collateral, which as stated above, the Court does not find.[64]  As such, this requirement of Section 4.1 has not been met.

---

*Allocation Opinion*, 546 B.R. at 582 (footnotes and citations omitted).

[63]  New Plan, Art. VI.E.4.

[64]  New Plan Art. VI.E.4.

### iv.    "Exercise of Remedies by the Collateral Agent"

DTC asserts that the New Plan Spin-Off was a culmination of the (i) assertion of claims, including by the Collateral Agent, for more than $24 billion against the TCEH Debtors' bankruptcy estate, (ii) negotiations of a complex series of transaction effectuating a taxable sale or disposition of First Lien Collateral involving the release of the Liens held by the Collateral Agent, (iii) assistance to the Debtors with incorporation those transactions into the terms of a chapter 11 plan (including certain actions or deemed actions therein by the Collateral Agent), (iv) solicitation of substantial support for that plan, including the contractual lock-up of the Collateral Agent's support therefor, and (v) assistance to the Debtors with the confirmation of that plan and consummation of the aforementioned transactions.    DTC asserts that it would have been impossible to accomplish these tasks *without* an exercise of remedies from the Collateral Agent sufficient to satisfy the preamble language of Section 4.1 of the Intercompany Agreement.

Again, there are no difference between the First Plan and the New Plan that would affect the Court's prior holding in the *Allocation Opinion*.   DTC raises three categories of arguments herein which will be discussed below.

First, DTC asserts that the Collateral Agent exercised remedies because the "New Plan and the Security Documents qualify the receipt of Collateral or its proceeds in-and-of itself as an exercise of remedies within the meaning of Section 4.1."[65]  As the Court held in the *Allocation Opinion*:

---

[65] DTC Mem. at 15.

> The Waterfall in Section 4.1 only applies if there was an "exercise of remedies."  The Court agrees that "simply" holding liens is not an exercise of remedies. Furthermore, in an Event of Default, the Collateral Agent would need to take direction Required Secured Parties in order to satisfy the Secured Obligations, which would be the case with Plan Distributions.  As such, all actions taken since the Petition Date (the filing of bankruptcy is an Event of Default) could only be upon the direction of the Required Secured Lenders.[66]

DTC also cites Section 5.3 of the Security Agreement as requiring that TCEH, upon the "exercise of remedies" by the Secured Parties, hold in trust for the Collateral Agent any proceeds of Collateral its receives.  As noted by the Intervenors, Section 5.3 does not address what constitutes an "exercise of remedies" and only supplements the Collateral Agent's powers under Section 5.1 to foreclose on accounts.  Section 5.3 also only applies to "cash, checks and other near cash items" and not to all proceeds of Collateral.[67]  The Plan Distributions cannot be characterized as "cash, checks, and other near-cash items."  DTC also refers to Sections 5.4 and 11.4 of the Security Agreement both of which refers back to Section 4.1, which contains the "exercise of remedies" requirement at issue here.  There are no changes between the First Plan and the New Plan to modify the Court's prior ruling as this arguments would render the phrase "exercise of remedies" requirement meaningless.

Second, DTC maintains that the Collateral Agent exercised a remedy by filing a proof of claim.  The Court has already ruled that it was not inclined to hold that filing of

---

[66] *Allocation Opinion*, 546 B.R. at 583–84 (footnotes and citations omitted).

[67] Security Agreement, § 5.3.

a proof of claim was an exercise of remedies.[68]  Furthermore, the Intercreditor Agreement

does not provide that filing a proof of claim is an exercise of remedies.[69]  In addition, the

Cash Collateral Order entered by the Court in these cases specifically stated that the First

Lien Creditors were exempted from filing a proof of claim.[70]  Furthermore, the proof of

claim will play no roles in generating Plan Distributions.  Thus, DTC's filing of a proof of

claim is not an "exercise of remedies."

Last, DTC asserts that the TCEH Supporting First Lien Creditors acted as the "de

facto" Collateral Agent by negotiating the Tax Matters Agreement and the Separation

Agreement.  The TCEH Supporting First Lien Creditors did not direct the Collateral

Agent to act, but negotiated the Chapter 11 plan individually.[71]  Accordingly, this

argument also fails.

Thus, the Collateral Agent did not and is not making an "exercise of remedies" in

order to distribute the New Plan distributions.

### E.  Post-Petition Interest

DTC asserts that the "rule of explicitness" dictates that the phrase "due and

payable" means that the senior creditor is entitled to interest "whether or not allowed or

allowable" in the underlying bankruptcy proceeding.  DTC argues that the drafters of the

---

[68] *Allocation Opinion*, 546 B.R. at 583-84.

[69] *See* Intercreditor Agreement, §§ 3.1(a), 3.1(c), 3.1(e).

[70] Cash Collateral Order, ¶ 23.

[71] *See* Intercreditor Agreement §§ 3.1(b) (allowing Secured Parties and Secured Debt Representatives to exercise rights of unsecured creditors in an insolvency proceeding); 3.1(d) (allowing actions by Secured Parties, including settlement of Secured Obligations).

Intercreditor Agreement defined "Secured Obligations" expressly to include Post-Petition Interest "regardless of whether or not allowed or allowable in any Insolvency or Liquidation Proceeding."[72]  DTC continues that the parties defined "Post-Petition Interest" expressly to include any interest "that accrues after the commencement of any Insolvency or Liquidation Proceeding, whether or not allowed or allowable in such Insolvency or Liquidation Proceeding."[73]  DTC concludes that the express intent of the parties was for the accrued unpaid post-petition interests to be included when allocating bankruptcy distributions between and among creditors under Section 4.1 even if such interest is not an allowable claim that the TCEH Debtors had to pay.

Section 4.1 is subject to Section 4.3 of the Intercreditor Agreement,[74]  Section 4.3(b) provides that distributions are to be made based on the "amount of the Secured Obligations then outstanding owed by the Borrower or any other Loan Party to the Secured Parties."[75]  Section 4.3 continues and requires certain certifications as to amounts "presently due and owing" before payments can be made pursuant to Section 4.1.[76]  The Debtors did not owe post-petition interest because the TCEH First Lien Lenders were

---

[72] Intercreditor Agreement, § 1.1 (definition of "Secured Obligations") (includes the phrase "regardless of whether such interest and fees are allowed claims in such [bankruptcy or insolvency] proceeding").

[73] Intercreditor Agreement, § 1.1 (definition of "Post-Petition Interest") ("Post Petition Interest" means any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any insolvency or Liquidation Proceeding, whether or not allowed or allowable in any such Insolvency or Liquidation Proceeding.").

[74] Intercreditor Agreement, § 4.1 (stating : "provided, that such amounts shall not be so applied until such time as the amount of the Secured Obligations has been determined in accordance with the terms hereof an under the terms of the relevant Financing Documents, including and subject to Sections 4.3 and **4.4** below" (emphasis provided)).

[75] Intercreditor Agreement, § 4.3(b).

[76] Id.

undersecured,[77] thus, post-petition interest was neither "due and payable" nor "due and owing."

DTC relies on *U.S. Bank Nat'l Assoc v. T.D. Bank, N.A.*,[78] which held that the Rule of Explicitness required post-petition interest to be paid to certain creditors in satisfaction of obligations owing to them under their respective financing documents even though such interest was not allowed in the borrower's bankruptcy.[79]  However, the *U.S. Bank* court never had to reach the decisions facing the Court in the case *sub judice* because it was undisputed in *U.S. Bank* that the distributions were subject to the intercreditor waterfall.  Herein, DTC's arguments fail because the Court finds that the Waterfall in Section 4.1 is not applicable to the New Plan Distributions.

Furthermore, DTC keeps circling back to the Third Circuit's recent make-whole decision in which the Court held that courts must "give effect to the intent of the parties as revealed by the language of their agreement."[80]  As such, there may indeed be a conflict between the definitions of Post-Petition Interest and Secured Obligations in Section 1.1 of the Intercreditor Agreement, which may entertain the allowance of post-petition interest

---

[77] *See* 11 U.S.C. § 506(c).

[78] No. 16 CIV. 441 (DAB), 2017 WL 436508 (S.D.N.Y. Jan. 27, 2017) (referred to herein as "*U.S. Bank*").

[79] *Id.* at *5-12.  The *U.S. Bank* court held that "[t]he Documents here both (1) define the Parties' obligations as including interest accruing after Bionol's bankruptcy proceeding and regardless of its status as an allowed claim in such proceeding; and (2) define interest as due and payable regardless of whether Bionol has declared bankruptcy, specifically including post-petition interest." *Id.* at *11.

U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A., No. 16 CIV. 441 (DAB), 2017 WL 436508, at *11 (S.D.N.Y. Jan. 27, 2017)

[80] *Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 842 F.3d 247, 261 (3d Cir. 2016).

as calculated against each of the First Lien Lenders regardless of whether allowed as against the Debtors; versus Sections 4.1 and 4.3 of the Intercreditor Agreement, which uses the phrases "due and payable" as against the Borrower.  Decidedly, it is not explicit in the documents.  In fact, there appears to be a series of internal contradictions within the Intercreditor Agreement.  It would be nonsensical to create the illusion of post-petition interest as between the First Lien Creditors when the Debtors were insolvent and the First Lien Creditors were undersecured – and if that is the illusion the drafters of the Intercreditor Agreement were attempting to achieve then the document is sorely lacking in clarity.

However, making this determination would be futile as the New Plan Distributions are not Collateral or proceeds of Collateral, were not received in connection with the sale or other disposition or collection on such Collateral, nor upon DTC's exercise of remedies under the Security Documents.  Thus, the Court need not decide the issue of whether the *third* waterfall of Section 4.1 provides for post-petition interest as calculated as if against the Debtors but not owed by the Debtors, because based on the above rulings, and the prior rulings of this Court, the Plan Distributions should not be distributed pursuant to Section 4.1 of the Intercreditor Agreement; but rather the waterfall provisions of the Bankruptcy Code.

## CONCLUSION

As set forth herein, DTC has not raised any new issues or any meaningful differences between the First Plan and the New Plan to warrant revising the Court's

*Allocation Opinion*.  For the reasons set forth in the *Allocation Opinion* and above, the Court will deny DTC's motion partially to vacate judgment.  The Court finds that the Petition Date Allocation Method is the appropriate method for distributing the New Plan Distributions.

An order will be issued.